400 P.2d 215

George DeARMAN and Indemnity Insurance Company of North America, Plaintiffs-Appellants,

v.

Tommy POPPS, a/k/a Tommy Popp, Sunset International Petroleum Corporation, a corporation, Defendants-Appellees.

No. 7498.

Supreme Court of New Mexico.

March 15, 1965.

**40**

Willard F. Kitts, Albuquerque, for appellant George DeArman.

Iden & Johnson, James T. Paulantis, Albuquerque, for appellant Indemnity Ins. Co. of North America.

Gilbert, White & Gilbert, W. B. Kelly, John F. McCarthy, Jr., Santa Fe, for appellees.

CHAVEZ, Justice.

Plaintiffs-appellants appeal from a summary judgment in favor of defendants-appellees, Tommy Popps and Sunset International Petroleum Corporation. The complaint against defendants, Dowell, Inc. and Dow Chemical Co., was dismissed and they are not involved in this appeal.

Plaintiff DeArman was an employee of Lawrence Drilling Company, hereinafter referred to as "Lawrence," and plaintiff Indemnity Insurance Company of North America, hereinafter referred to as "Indemnity," had issued to Lawrence a workmen's compensation insurance policy. By reason of this policy and the injuries sustained by DeArman, Indemnity paid to DeArman compensation and medical expenses under the Workmen's Compensation Act, and joined as party-plaintiff in this action to recover said payments as well as any future sums they should be required to pay, pursuant to their rights of subrogation.

DeArman, at the time of the injury, was working for Lawrence as a roughneck and floorman on a gas well in San Juan County, New Mexico. The well was owned by defendant Sunset International Petroleum Corporation, hereinafter referred to as "Sunset," and Lawrence was performing certain well-service work for Sunset as an independent contractor. Defendant Tommy Popps, an employee of Sunset, was the job superintendent at the well location and was working within the scope of his employment at all times pertinent to this case. On the morning of the injury DeArman, along with two other members of his drilling crew from Lawrence, were preparing to clean or "wash down" the well. In preparing for this operation they were running two-inch tubing, or joints of pipe, into the well hole. The only persons on the rig floor at that time were employees of Lawrence and the rig and all equipment, with the exception of the circulating head, were owned by Lawrence.

In performing this work DeArman and his fellow crew members were using an arrangement or assembly of pipes, nipples, valves, unions, etc., which were generally known and referred to in the pleadings and during the course of the depositions taken as a "circulating head" hookup or assembly. This circulating head was attached to the top of the 30-foot joint of two-inch pipe or tubing, which DeArman was screwing into a collar near the floor level of the rig, and was in such a position at that time that the assembly was 30 to 35 feet directly above the floor level where DeArman was working.

The circulating head equipment belonged to Dowell, Inc., another independent contractor on the job, who used the same assembly and hookup for abrasijetting, a well service performed by that company. The circulating head equipment was supplied and furnished by the defendants to Lawrence for use in the "wash down" operation.

Prior to the commencement of the cleaning operation, Popps had requested, or suggested, that the circulating head arrangement be utilized by Lawrence in doing this work. Pursuant to this request, or sug-

gestion, the circulating head was assembled and placed at the top of the tubing by DeArman and his fellow employees from Lawrence. Immediately thereafter, while DeArman was screwing the joint of tubing into a collar near the rig floor, the circulating head became disengaged or "backed out" during the rotation of the joint of pipe and fell to the rig floor striking and injuring DeArman. Lawrence's foreman, Phelan Zumwalt, testified that at the time of the accident no safety chains were being used in connection with the circulating head.

During Dowell's abrasijetting operations there was no rotation of the pipe and there was no necessity for any personnel to be upon the floor of the rig. It was for these reasons that, in the opinion of the witnesses for Dowell, no safety chains would be necessary during the abrasijetting operation. A different situation would exist, however, in the wash down operation, with Lawrence's crew members, of necessity, being on the rig floor and the length of pipe necessarily being rotated. From the witnesses' testimony and as seen by plaintiffs' exhibit No. 2, there was another practical and desirable assembly for use in wash down operations. When using either the Kelly assembly or the Baker swivel, a swivel is utilized which permits complete rotation of the pipe and minimizes the danger of the pipe "backing out."

At all times material hereto Sunset, through its employee Popps, maintained control of its premises to the extent that it was superintending the work of Lawrence and of other service companies working on the well, to see that the various jobs were performed expeditiously and that desired results were being achieved.

The job had not been proceeding to Popps' satisfaction and delays had been encountered which held up the job. Although Popps did not want to push the various independent contractors, he was disappointed in the delay and wanted them to do the job "the best and as fast as they could." This, together with the fact that the circulating head hookup was already assembled, influenced the decision to use the circulating head assembly for the wash down operation.

A few moments before the accident, when the 30-foot joint of pipe nearly backed out of the swedge, Zumwalt informed Popps of the difficulty and told Popps that he preferred to use an assembly employing the swivel. However, Popps said he preferred to use the circulating head assembly being utilized and this was done. Popps also testified that Mr. Lawrence of Lawrence Drilling Company had objected to the hookup prior to the accident.

Popps had used the circulating head assembly on numerous occasions before this job but never before in wash down opera-

tions. When Popps used the hookup previously in other operations, he had utilized safety chains. Nothing was said about safety chains on the morning of the accident. Zumwalt admitted that he thought nothing about safety chains that morning and testified that it was part of his job to apply or install the chains. DeArman testified that he had never worked on this type of job or with this type of circulating head assembly before and, likewise, thought nothing about the use of safety chains. DeArman, however, was an experienced roughneck; he was familiar with the use of safety chains and knew their purpose; and he was aware that the pipe had "backed out," but not completely, just before the accident.

█ Under their first point, appellants contend that the evidence of record, together with all logical inferences reasonably deducible therefrom, received in the light most favorable to plaintiffs, shows that there are questions of material fact to be decided, and that the trial court erred in granting summary judgment. Appellants state that there is evidence to support the contention that, having undertaken to suggest, direct, or request the use of a circulating head, and having supplied the equipment for the use of Lawrence, Popps should reasonably have foreseen that, unless adequate precautions were taken, the type of catastrophe which did actually occur was likely to happen. Appellants contend that

in this respect appellee breached his duty to appellant. Appellees, on the contrary, argue that there are no issues of material fact because they cannot be liable in this action regardless of how the question as to the existence of the duty is resolved. If no duty is found, there can, of course, be no liability. It is appellees' position that such a duty could only be established because of the control Sunset exercised over the work, in which event DeArman and Lawrence would, as a matter of law, be employees of Sunset, thus making workmen's compensation the exclusive remedy.

Appellants' contention is well founded and the trial court was in error in holding that, as a matter of law, the appellees were not liable. In Coca v. Arceo, 71 N.M. 186, 376 P.2d 970, this court stated:

> "Particularly with respect to the use of summary judgment in a negligence action, 6 Moore's Federal Practice 2232, § 56.17(42), states as follows:
>
> > " '[It is] the general proposition that issues of negligence, including such related issues as contributory negligence, are ordinarily not susceptible of summary adjudication either for or against the claimant, but should be resolved by trial in the ordinary manner.'
>
> "It would seem that, especially in negligence cases, the weight of authority is to deny summary judgment, for

the obvious reason that there are ordinarily material fact issues to be determined. In the few cases cited by Professor Moore in which summary judgment was granted in negligence cases, it has been done only when it appeared that the party seeking the summary judgment could in no sense have been determined responsible, or where the plaintiff actually admitted no negligence, or failed to deny that the accident happened in such a manner as to show lack of negligence."

In Reed v. Fish Engineering Corporation, 74 N.M. 45, 390 P.2d 283, this court stated:

"* * * As we have said time and again, summary judgment should not be granted where disputed issues of material fact are present. * * * In addition, all doubts as to the existence of an issue of fact are to be resolved against the one seeking summary judgment. * * *"

In Coca v. Arceo, supra, we also stated:
"* * * where an appeal is taken from a summary judgment, this court will review the testimony in the most favorable aspect it will bear in support of plaintiff's claim of the right to present the merits of his case to the factfinder. * * * Litigants are entitled to the right of trial where there is the slightest doubt as to the facts.

* * * In summary judgment, the burden is on the moving party to clearly establish that there is no factual issue to be determined, and the burden is not upon the opposing party to prove a prima facie case. * * *"

In Sarkes Tarzian, Inc. v. United States, (7 CCA 1957), 240 F.2d 467, cited in Hewitt-Robins, Inc. v. Lea County Sand & Gravel, Inc., 70 N.M. 144, 371 P.2d 795, the court stated:

"* * * If the determination of this motion for a summary judgment required the trial court to choose between conflicting possible inferences from the evidence the motion should not have been granted. * * *

"In other words, if a finding on the ultimate fact for either party is possible, the movant is obviously not entitled to judgment as a matter of law. There was evidence in this cause consistent with the contentions of each of the parties. The drawing of inferences arising out of the evidentiary facts—whether disputed or undisputed—is ordinarily for the fact finder. Thus, summary judgment must be denied if the evidence is such that conflicting inferences could be drawn therefrom.

* * *"

We see nothing in Bogart v. Hester, 66 N.M. 311, 347 P.2d 327, relied on by ap-

pellees, which in any way detracts from the foregoing.

After reviewing the facts and the case law on summary judgment in New Mexico, we must now determine whether the substantive case law would support the decision of the trial court, that there is no factual issue to be decided, and that as a matter of law neither defendant is liable.

Popps, Sunset's superintendent on the job, was a man of experience and knowledge in oil field operations; he had used the circulating head before and had employed safety chains in such prior use. Whether Popps "ordered" or "requested" the use of the circulating head equipment is unimportant, for it is undisputed that Popps did supply the assembly to plaintiff. The fact that Sunset did not own the circulating head is immaterial. Restatement of the Law, Torts, § 392, Comment C, p. 1064, states:

"One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied:

"(a) if the supplier has failed to exercise reasonable care to make the chattel safe for the use for which it is supplied, * * *."

The court stated in Bergquist v. Penterman, 46 N.J.Super. 74, 134 A.2d 20:

"* * * The employer of an independent contractor will also be held liable if the work was of a kind which the employer should have recognized would during its progress necessarily create the danger of the mishap which occurred, and thus contained or involved an unreasonable or peculiar risk of bodily harm to plaintiff unless special precautions were taken. * * *

"* * * *

"* * * A specific formulation of the rule applicable in this situation is to be found in 2 Restatement, Torts, § 414, p. 1120 (1934):

"'One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.' * * * [Italics omitted].

**46**

Under Comment (a) it is noted that

" ' * * * The employer may, however, retain control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done * * *. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.' "

In Restatement of the Law, Torts, § 414, p. 1121, it is further stated under Comment (b):

"The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done and has the opportunity to prevent it by exercising the power of control which he has retained in himself. * * * "

Compare, Tipton v. Clower Drilling Co., 67 N.M. 388, 356 P.2d 46.

In Trecartin v. Mahony-Troast Const. Co., 18 N.J.Super. 380, 87 A.2d 349, aff'd 21 N.J. 1, 120 A.2d 733, the court stated:

" * * * But when the general contractor gives specific instructions which necessarily involve the safety of the subcontractor's employees, actively interfering with the subcontractor's supplying of safeguards, and participating in the subcontractor's failure to supply them, an exception subjecting the general contractor to liability for negligence is recognized. * * * "

In that case there was testimony that the general contractor's foreman refused to produce safety belts since "the biggest part of the job is finished. * * * It will only hold the job up." Although this occurrence was denied, the court found that, if believed, the testimony would support a finding that the general contractor was negligent.

In Wolczak v. National Electric Products Corp., 66 N.J.Super. 64, 168 A.2d 412, the court stated:

"The liability of a general contractor to employees of subcontractors performing construction or other work on the premises is founded in part on the assumption that the owner has placed the general contractor in physical control of the job site; by virtue of this

control, the general contractor is burdened with a duty similar to that owed by the landowner to business invitees, to exercise reasonable care to maintain the premises in a reasonably safe condition. * * * In addition, his supervision of or active participation in the manner of work of the subcontractor may result in the imposition of a broader duty of care, premised essentially on the emergence of a sufficient degree of detailed superintendence over the latter's employees as to invoke a legal relationship analogous to that of master-servant. * * *

"Absent control over the job location or direction of the manner in which the delegated tasks are carried out, the general contractor is not liable for injuries to employees of the subcontractor resulting from either the condition of the premises or the manner in which the work is performed. * * * Nor is his immunity disturbed by the exercise of merely such general superintendence as is necessary to insure that the subcontractor performs his agreement. * * * Of course, specific instances of direct interference which proximately cause injury to the employees of the subcontractor—such as the furnishing of defective materials * * * or the giving of a single authorized direction thwarting the subcontractor's effort to provide safeguards * * *

—will heap liability upon the shoulders of the general contractor."

In Burruss v. B. M. C. Logging Co., 38 N.M. 254, 31 P.2d 263, this court stated with regard to the question of a worker being an employee or independent contractor:

"Mere suggestions do not count against the status or relation. Nor does that directing control essential to co-ordinate the several parts of a larger undertaking. This is conceded everywhere. And all agree, in statement if not in application, that it is the right to control, not the exercise of it, that furnishes the test."

In Vol. 2, Harper and James, The Law of Torts, § 26.1, pp. 1362–1363, it is stated:

"Another thing to be noted is that A's own wrong may have contributed in some way to the causing of harm to C through B's wrongful conduct. A may have commanded or procured that very wrong. A may have been negligent in choosing B to do a job which he should have known was over B's head * * * A may have been derelict in failing to stop B from doing something obviously dangerous, when he had the chance and the duty to do so. Or A may have failed in his duty to C to inspect work that A employed B to do. But in these cases, if a causal connection can be traced between A's

own wrong and C's injury, there is no need to invoke vicarious liability. The principle which rests liability on individualized fault covers these situations without any fiction, extension or distortion."

In 27 Am.Jur., Independent Contractors, § 30, pp. 509–510, it is stated:

" * * * Also, where the employer reserves the right to direct the manner of the performance of the contract in any particular, or where he undertakes to provide any of the instrumentalities, he owes to the contractor and the latter's employees the duty of exercising reasonable care with respect to such matters. * * * "

And in 27 Am.Jur., Independent Contractors, § 31, pp. 510–511, we find the following:

" * * * or assuming that the contractor is independent and has full control over the work, the employer's liability may be based on meddling, and he will be held liable for the results of his interference with, or control of, the work. * * * "

See also, 27 Am.Jur., Independent Contractors, § 36, pp. 513–514:

" * * * If, therefore, recovery is sought on the ground that an employer should have adopted certain precautionary measures for the purpose of preventing the injury complained of,

the action must fail, unless the plaintiff can at least show that, in view of the nature of the work and the conditions under which it was to be executed, the defendant should have foreseen that the actual catastrophe which occurred was likely to happen if those precautionary measures were omitted. * * * "

In the light of the above authorities, it is apparent that summary judgment was improper. There is an issue of fact as to whether Popps should have reasonably foreseen the danger and subsequent injury to DeArman when no safety chains were used. The questions of concurrent negligence of Lawrence's foreman, any intervening negligence caused by such foreman, or DeArman's contributory negligence, are all questions of fact in this instance.

Appellees argue that DeArman was an employee of Sunset and cite three New Mexico cases in support of this contention. Burruss v. B. M. C. Logging Co., supra; Bailey v. Farr, 66 N.M. 162, 344 P.2d 173; and Shipman v. Macco Corporation, 74 N.M. 174, 392 P.2d 9. These cases are distinguishable from the case before us.

In the instant case DeArman and Lawrence were only supervised generally by Popps and Sunset, and conducted their work details in their own manner. Also, DeArman was under the direct supervision

of Zumwalt, Lawrence's foreman. In Burruss v. B. M. C. Logging Co., supra, the deceased was found to be an employee (truck driver) because, as this court stated:

> "In this particular case, the fatal fact, as we see it, is that found at appellee's request, that appellant logging company 'retained the right to employ and discharge the deceased at its will.' If the deceased had been engaged to do a specific job, having the independence of means and method disclosed by the findings, it might have been a proper conclusion that he was an independent contractor. But his contract was unlimited as to time or result. It was not for any number of days or hauls; not for any specific logs or any designated quantity. From a practical standpoint, the deceased was in a position of complete subservience. His position required obedience to any direction, however minute or unreasonable, on pain of instant termination of the relation, whatever it was."

In the case before us DeArman at all times was paid, employed, and subject to discharge by Lawrence, and Lawrence was hired to do one specific job for Sunset. Lawrence had its own independence of means and methods, subject only to Sunset's general supervision of the desired results. Neither Lawrence nor DeArman were at any time in a position of complete subservience to Sunset, and under the authorities cited, supra, there can be no question that DeArman was an employee of Lawrence and not of Sunset.

Appellees raise the further point that since appellants failed to tender specific findings of fact and conclusions of law to the trial court, or to make a general request therefor in writing, they have failed to preserve any points for review and have no standing to prosecute this appeal.

Our Rule 52(B), (§ 21-1-1 (52) (B), N.M.S.A., 1953 Comp.), requires findings of fact, etc., where the case is tried on the merits without a jury. Hewitt-Robins, Inc. v. Lea County Sand & Gravel, Inc., supra; Zengerle v. Commonwealth Insurance Co. of N. Y., 60 N.M. 379, 291 P.2d 1099, hold that summary judgment is neither a trial nor a substitute for trial. It follows that they also support a proposition that a tender or request for findings and conclusions is not required in summary judgment to preserve points for review.

The case is remanded to the district court with direction to set aside the summary judgment and proceed in a manner not inconsistent with this opinion. It is so ordered.

NOBLE and MOISE, JJ., concur.