428 A.2d 1343

Richard B. ENGLISH, Administrator of the Estate of
Thomas R. English, Deceased

v.

LEHIGH COUNTY AUTHORITY, Malcolm Pirnie, Inc.,
and Kelly Service, Inc.

Appeal of KELLY LABOR OF ALLENTOWN, INC.

Richard B. ENGLISH, Administrator of the Estate of
Thomas R. English, Deceased

v.

A. L. WIESENBERGER ASSOCIATES, INC. and Kelly
Labor of Allentown, Inc.

Appeal of KELLY LABOR OF ALLENTOWN, INC.

Richard B. ENGLISH, Administrator of the Estate of
Thomas R. English, Deceased

v.

LEHIGH COUNTY AUTHORITY, Malcolm Pirnie, Inc.,
and Kelly Service, Inc.

Richard B. ENGLISH, Administrator of the Estate of Thomas
R. English, Deceased, Appellant,

v.

A. L. WIESENBERGER ASSOCIATES, INC. and Kelly
Labor of Allentown, Inc.

Richard B. ENGLISH, Administrator of the Estate of
Thomas R. English, Deceased

v.

LEHIGH COUNTY AUTHORITY, Malcolm Pirnie, Inc.
and Kelly Service, Inc.

Appeal of A. L. WIESENBERGER ASSOC., INC.

Richard B. ENGLISH, Administrator of the Estate of
Thomas R. English, Deceased

v.

A. L. WIESENBERGER ASSOCIATES, INC. and Kelly
Labor of Allentown, Inc.

Appeal of A. L. WIESENBERGER, ASSOC., INC.

Richard B. ENGLISH, Administrator of the Estate of
Thomas R. English, Deceased

v.

LEHIGH COUNTY AUTHORITY, Malcolm Pirnie, Inc.,
and Kelly Service, Inc.

and

Richard B. ENGLISH, Administrator of the Estate of
Thomas R. English, Deceased

v.

A. L. WIESENBERGER ASSOCIATES, INC. and Kelly
Labor of Allentown, Inc.

Appeal of KELLY LABOR OF ALLENTOWN, INC.

Superior Court of Pennsylvania.

Argued Sept. 8, 1980.

Filed Jan. 16, 1981.

Reargument Denied April 27, 1981.

Petition for Allowance of Appeal Granted July 17, 1981.

314

Jerry A. Snyder, Allentown, for Kelly Labor, appellant in Nos. 2078, 2079 and 410 and appellee in Nos. 2081 and 2083.

Keith S. Erbstein, Philadelphia, for English, appellee in Nos. 2078, 2079, 2082, 2083, and 410 and appellant in Nos. 2080 and 2081.

Joseph Leeson, Bethlehem, for Lehigh County, appellee in Nos. 2078, 2080, 2082 and 410.

John Mason, Philadelphia, for Malcolm Pirnie, appellee in Nos. 2078, 2082 and 410.

David L. Pennington, Philadelphia, for Kelly Service, appellee in Nos. 2078, 2080, 2082 and 410.

Gary S. Figore, Easton, for Wiesenberger, appellee in Nos. 2079, 2081 and 410 and appellant in Nos. 2082 and 2083.

Thomas J. Calnan, Jr., Allentown, for Malcolm Pirnie, appellee in No. 2080.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

This case arises on consolidated appeals from orders granting summary judgment.

On July 13 or 14, 1973, Thomas R. English died as a result of inhaling noxious fumes. His administrator, Richard B. English, brought two actions to recover damages under the wrongful death or survival statutes, or under both. The first action, No. 221 September Term 1974, is against Lehigh County Authority, Malcolm Pirnie, Inc., and Kelly Services, Inc. The second action No. 544 April Term 1975, is against A. L. Wiesenberger Associates, Inc., and Kelly Labor of

Allentown, Inc. In the second action, Wisenberger joined the Authority, Pirnie, and Kelly Services as additional defendants. The actions were consolidated for trial. The Authority moved for summary judgment on the theory that Thomas English had been its employee and, therefore, under the Workmen's Compensation Act, it was immune from suit. Kelly Labor moved for summary judgment on the theory that English had been *its* employee and, therefore, under the Workmen's Compensation Act, *it* was immune from suit. Kelly Services moved for summary judgment on the theory that it had not violated any duty to English. The lower court concluded that English had been the Authority's employee, and not Kelly Labor's. It therefore granted the Authority's motion, and denied Kelly Labor's. The lower court further concluded that Kelly Services had not violated any duty to English, and therefore granted its motion.[1]

## 1

### Was Lehigh County Authority or Kelly Labor Thomas English's employer for workmen's compensation purposes?

Kelly Labor is a franchisee of Kelly Services. Its business is to provide temporary laborers, called "Kelly Workers." "Kelly Workers" are paid by Kelly Labor but only if they work for one of Kelly Labor's customers. Kelly Labor withholds federal, state, and local income taxes as well as social security payments from its workers' wages. It also pays unemployment compensation tax, maintains workmen's compensation insurance, and issues W–2 forms to its workers. It bills its customers at a rate that provides the funds

---

1. One of the appeals before us is Kelly Labor's appeal from the lower court's order denying its motion for summary judgment. Since this appeal is from an interlocutory order, it will be quashed. 42 Pa.C.S. § 742. *See Adoption of G.M.*, 484 Pa. 24, 398 A.2d 642 (1979); *Bell v. Beneficial Consumer Discount Co.*, 465 Pa. 225, 348 A.2d 734 (1975); *Venture v. Skylark Motel, Inc.*, 431 Pa. 459, 246 A.2d 353 (1968). As a practical matter, however, this is of no significance, for in deciding the appeals by English's administrator and Wisenberger from the orders granting summary judgment in favor of the Authority, we shall necessarily decide whether the Authority or Kelly Labor was English's employer.

necessary to pay both its workers' wages and these several deductions and expenses. Kelly Labor has the exclusive right to hire and discharge its workers, and to remove workers from one customer and assign them to another.

In 1973 Kelly Labor entered into a written contract with the Lehigh County Authority go supply temporary labor to take samples of sewage pursuant to a program designed by Malcolm Pirnie, Inc.; the sewage system itself had been designed by A.L. Wiesenberger Associates, Inc. The agreement required Kelly Labor to supply the Authority with enough labor for an around-the-clock sampling at a sewage metering station commonly known as "the pit." The sampling began on Thursday, July 12, 1973. Kelly Labor supplied three of its Kelly Workers: Charles Alley, Wayne Nagle, and a third person, who is unidentified. When the unidentified person failed to report for work, Thomas English was directed by Kelly Labor to report in his place. English had applied to Kelly Labor for employment during the summer of 1973, and had received several assignments for which he had been paid wages. On Friday, July 13, he reported to Marlyn Stroh, an Authority employee, at a sewage pretreatment plant. Stroh directed English to report to the metering station, which was about ten miles away. There English was supposed to go into the pit every half hour to remove samples of sewage for testing. He was supposed to relieve Nagle and work until 8:00 a. m. on Saturday, July 14. When Alley reported for work at 8:00 a. m. on Saturday, he found Nagle and English at the bottom of the pit dead. The two young men had apparently died from noxious fumes that emanated from the sewage.

## A.

■ English's administrator and Wiesenberger first argue that the Authority has waived its right to raise the defense of immunity under the Workmen's Compensation Act, Act of 1915, June 2, P.L. 736, 77 P.S. § 1 et seq.

In its answer and new matter the Authority pleaded that it was immune as a statutory employer under § 52 of the Act, which provides as follows:

An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employe or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own employe.
77 P.S. § 52.

As the lower court observed, slip op. at 16, this provision typically applies to the construction industry, where a general contractor subcontracts work to others, and the question arises whether an injured employee of the subcontractor may bring an action in trespass against the general contractor. *See McDonald v. Levinson Steel*, 302 Pa. 287, 153 A. 424 (1930). In a memorandum of law filed with the lower court, English's administrator took the position that the Authority did not qualify as a statutory employer. The authority apparently then abandoned its claim that it had been English's statutory employer, and instead argued that it was entitled to immunity as an "employer" under Section 481 of the Workmen's Compensation Act. It is the position of English's administrator and Wiesenberger that the Authority should not have been allowed thus to "expand" its defense.

"Employer" is defined in the Act as follows:

The term "employer," as used in this act, is declared to be synonymous with master, and to include natural persons, partnerships, joint-stock companies, corporations for profit, corporations not for profit, municipal corporations, the Commonwealth, and all governmental agencies created by it.
77 P.S. § 21.

Section 481 of the Act provides:

(a) The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account

of any injury or death as defined in section 301(c)(1) and (2) or occupational disease as defined in section 108.

(b) In the event injury or death to an employe is caused by a third party, then such employe, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to receive damages by reason thereof, may bring their action at law against such third party, but the employer, his insurance carrier, their servants and agents, employes, representatives acting on their behalf or at their request shall not be liable to a third party for damages, contribution, or indemnity in any action at law, or otherwise, unless liability for such damages, contributions or indemnity shall be expressly provided for in a written contract entered into by the party alleged to be liable prior to the date of the occurrence which gave rise to the action.

77 P.S. § 481.

Rule 1032 of the Pennsylvania Rules of Civil Procedure states:

A party waives all defenses and objections which he does not present either by preliminary objection, answer or reply. . . .

A literal reading of Rule 1032 would seem to bar the Authority from raising the defense of "general employer" as distinguished from "statutory employer." However, the rules are not to be read literally. Rule 126 states:

The Rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The Court at every stage of any proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.

The lower court held that liberally construed, Rule 1032 did not preclude the Authority from arguing its immunity as a general employer. In the court's opinion, English's administrator and Wiesenberger were "clearly . . . on notice that [the] . . . Authority was claiming a general immunity as an employer under the Act . . . ." Slip op. at 17. In addition,

the court found that the administrator and Wiesenberger had suffered no prejudice. *Id.*

A review of the pre-trial documents persuades us that the lower court was correct.

In September 1974 the administrator submitted the following interrogatory to the Authority:

77. Describe in detail the nature of your relationship, past and present, with the following:

* * * * * *

(b) Kelly Services, Inc.

In June 1975, more than three years before its motion for summary judgment the Authority answered as follows:

77. ....

(b) Customer. Kelly Services, Inc. furnished to the defendant the employees to perform our work. *Said employees were the employees of Lehigh County Authority.* (Emphasis added.)

In April 1977, in its pre-trial memorandum, the Authority stated:

At the time of the occurence, the plaintiff decedent, Thomas R. English, *was an employee of the Lehigh County Authority,* defendant herein, and *covered under workmens' [sic] compensation which is a bar to recovery against the Lehigh County Authority.* (Emphasis added.)

Finally, we note that "Plaintiff's [the administrator's] Reply to Defendant's [the Authority's] Motion for Summary Judgment" provided an extensive and thorough analysis of the issues involved in determining whether the Authority was a general employer. All the facts relevant to the analysis seem to have been known to the administrator at that time.[2]

**2.** We fail to see, and have not been informed, what possible testimony the deceased Authority director could have provided throwing any further light on English's employment relationship with the Authority. Since this is the only specific example of prejudice mentioned by English's administrator, we are unable to find that the administrator suffered any loss of factual knowledge as a result of the Authority's pleading.

322

B.

In deciding whether the Lehigh County Authority was the employer of Thomas English at the time of his death within Section 481 of the Workmen's Compensation Act, any discrepancies in the facts would be for a jury to resolve; however, whether the facts as they are determined to exist constitute an employment relationship is strictly a question of law. *Workmen's Compensation Appeal Board v. Dupes*, 24 Pa.Cmwlth. 47, 353 A.2d 908 (1976); *McManus v. Kuhn*, 194 Pa.Super. 544, 168 A.2d 618 (1961); *Potash v. Bonaccurso*, 179 Pa.Super. 582, 117 A.2d 803 (1956); *See also, Barnett v. Bowser*, 176 Pa.Super. 17, 106 A.2d 457 (1954) (whether employment is "casual" is a question of law). Accordingly, we shall resolve all discrepancies in the facts in favor of English's administrator and Wiesenberger as the non-moving parties and give them the benefit of all reasonable inferences arising from the facts as thus determined. *Ritmanich v. Jonnel Enterprises, Inc.*, 219 Pa.Super. 198, 280 A.2d 570 (1971); *Schacter v. Albert*, 212 Pa.Super. 58, 239 A.2d 841 (1968).

(i)

The test for determining whether a borrowing employer is an employer for workmen's compensation purposes is whether the *employer controlled, or had the right to control*, the borrowed employees, "not only with regard to the work to be done but also with regard to their manner of performing it." *Venezia v. Philadelphia Electric Co.*, 317 Pa. 557, 559, 177 A. 25, (1935). *See also, Mature v. Angelo*, 373 Pa. 593, 97 A.2d 59 (1953); *Walters v. Kaufmann Department Stores, Inc.*, 334 Pa. 233, 5 A.2d 559 (1939); *Hattler v. Wayne County*, 320 Pa. 280, 182 A. 526 (1936); *Atherholt v. Stoddart Co.*, 286 Pa. 278, 133 A. 504 (1926); *Tarr v. Hecla Coal & Coke Co.*, 265 Pa. 519, 109 A. 224 (1920); *Puhlman v. Excelsior Express & Standard Cab Co.*, 259 Pa. 393, 103 A. 218 (1918); *Walton v. Harold M. Kelly, Inc.*, 218 Pa.Super. 28, 269 A.2d 347 (1970); *Stevens v. Publishers Agency*, 170 Pa.Super. 385, 85 A.2d 696 (1952); *Fanning v. Apawana Golf*

*Club,* 169 Pa.Super. 180, 82 A.2d 584 (1951); *Nilsson v. Nepi Brothers,* 138 Pa.Super. 107, 9 A.2d 912 (1939); *aff'd Nilsson v. Nepi Bros.,* 338 Pa. 561, 14 A.2d 75 (1940). *Frederico Granero Co. v. Workmen's Compensation Appeal Board,* 43 Pa.Cmwlth. 308, 402 A.2d 312 (1979); *City of Monessen v. Workmen's Compensation Appeal Board,* 36 Pa. Cmwlth. 226, 387 A.2d 1000 (1978); *Reasner v. Workmen's Compensation Appeal Board,* 36 Pa.Cmwlth. 292, 387 A.2d 679 (1978); *Grant Builders v. Workmen's Compensation Appeal Board,* 33 Pa.Cmwlth. 591, 382 A.2d 783 (1978); *Barr v. B&B Camper Sales,* 7 Pa.Cmwlth. 323, 300 A.2d 304 (1973). English's administrator and Wiesenberger argue that Kelly Labor had the right to control the "Kelly Workers" it sent to work at the Authority's metering station because: Kelly Labor hired and initially assigned its workers to various customers; it retained the right to fire or discipline its workers; it had exclusive control over the job assignments undertaken by its workers once assigned to a customer; and it paid its workers' wages and unemployment compensation tax, carried its workers' workmen's compensation insurance, and withheld federal, state, and local taxes from its workers' wages.

While we agree that Kelly Labor retained some control over its workers, we have nevertheless concluded that the lower court was correct in holding that for workmen's compensation purposes, not Kelly Labor but the Authority was English's employer.

Although Kelly Labor had almost absolute control over which of its workers would service the needs of which of its customers, it had no significant control over the manner in which the workers carried out the work to which they were assigned. Thus, for example, while Kelly Labor was responsible for placing Thomas English into the service of the Authority, once he arrived Kelly Labor did not purport to instruct English on how he should carry out the Authority's sewage testing program. That was clearly the province of the Authority. Kelly Labor had no supervisory personnel of any kind at the job site; nor did it contemplate training its

workers to perform the various tasks to which it assigned them at the request of its customers.[3]

In *Venezia v. Philadelphia Electric Co., supra*, it appeared that a labor contractor, in addition to lending out employees, sent a "boss" to the job site to assign jobs to the "lent" employees, to keep records of the time the "lent" employees worked, and to check on the presence of the employees at their assigned work sites. Our Supreme Court held that this evidence was still insufficient to establish such "control" over the manner of the work to be performed as would constitute an employment relationship between the labor contractor and the lent employees. *Venezia v. Philadelphia Electric Co., supra*, 317 Pa. at 558, 177 A. at 26. Kelly Labor exercised no greater control—indeed it exercised less—over English and the other workers it sent to the Authority than did the labor contractor in *Venezia* over the workers he lent out. Similarly, in *City of Monessen v. Workmen's Compensation Appeal Board*, 36 Pa.Cmwlth. 226, 387 A.2d 1000 (1978), the Commonwealth Court found the city to be the employer of an off-duty police officer who was hired, and paid, by the school district to direct traffic following a football game. The school district, like Kelly Labor, had control over the number of employees and their specific job assignments. The city, however, had retained the right to control the conduct of off-duty police officers when acting as special police officers for the school district. *Id.*, 36 Pa.Cmwlth. at 230–31, 387 A.2d at 1001–03.

**3.** The mere fact that Kelly Worker Wayne Nagle was supposed to instruct English on the procedure for sampling sewage at the pit may not, contrary to the suggestion of English's administrator, be considered an exercise of Kelly Labor's supervisory power over English. Nagle was not a Kelly Labor supervisor; he had the exact same status as did English. While Nagle was acting under the direction of the Authority, he was, as was English, an employee of the Authority and not of Kelly Labor. Such instructions as the Authority contemplated Nagle giving English must therefore be viewed as instructions of a fellow Authority employee. Consequently, we find no merit to the contention of English's administrator that "it was never contemplated that any of [the Authority's] employees would be at the job site" (Brief for appellant-English at 5); in fact the Authority did contemplate leaving Nagle at the job site to instruct English on how to remove the sewage (R. at 10a).

English's administrator suggests that because the sampling project entailed a minimum amount of labor management, there was an insufficient quantum of control by the Authority to create an employment relationship. Brief for Appellant English at 22. However, it is the existence of the *right* to control, and not only its exercise, that creates an employment relationship. Although it is true that the Authority did not exercise much control over the sampling project, had it chosen to, it could have exercised complete control; it could have required, for instance, that anyone entering the "pit" wear a gas mask; that no more than one worker enter the pit at any one time; that the workers "phone-in" after each sampling; and that emergency air supplies be readily accessible to those who entered the pit. The fact that the Authority did not exercise such control demonstrates, not its lack of authority, but its negligence.

The other indicia of an employment relationship relied on by the administrator and Wiesenberger do not indicate which party was in control of the work to be done, but only which party was responsible for processing the papers and expenses associated with an employment relationship. Thus, while Kelly Labor paid its workers' wages and unemployment compensation tax, carried its workers' workmen's compensation insurance, and withheld federal, state, and local taxes from its workers' wages, it risked none of its own money, for it made these payments from the monies it received from its customers. The mere fact that one incurs expenses normally associated with an employment relationship does not necessarily mean that one is an "employer" within the meaning of the Workmen's Compensation Act. *See e. g., Stevens v. Publishers Agency, supra* (method of accounting for social security or income tax not determinative of employment relationship); *Reynolds v. Reihart,* 47 Pa.Cmwlth. 602, 408 A.2d 897 (1979) (existence of workmen's compensation insurance policy maintained by alleged employer not conclusive evidence as to who is the employer); *Workmen's Compensation Appeals Board v. Bond Transport, Inc.,* 22 Pa.Cmwlth. 86, 347 A.2d 788 (1975) (accounting of

payroll wages, deduction of income tax, payment of unemployment compensation and other insurance coverage not conclusive on issue of employment but only evidence of an employment relationship).

(ii)

English's administrator argues that the Authority could not have been English's employer because there was no employment contract, express or implied, between the Authority and English. Brief for Appellant English at 13–17. In support of this argument several decisions are cited for the proposition that a "contract of employment for wages, express or implied" is a necessary condition of an employment relationship under the Act. *See Harris v. Seiavitch*, 336 Pa. 294, 9 A.2d 375, (1939); *Stewart v. Uryc*, 237 Pa.Super. 258, 352 A.2d 465 (1975); *Reasner v. Workmen's Compensation Appeal Board, supra; Barr v. B&B Camper Sales, supra.* Also cited is leading treatise on workmen's compensation law, which states as black letter law:

> When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if
>
> (a) the employee has made a contract of hire, express or implied, with the special employer
>
> . . . .

Larson's Workmen's Compensation Law § 48 at 8–205.

The proposition thus urged upon us is stated too broadly. While it is true as a general proposition that proof of a master-servant relationship is required before the Workmen's Compensation Act will be held applicable, there is no requirement that before a special employer will be held subject to the Act, and therefore immune from an action in trespass, there must have been a contract of hire, either express or implied, between the special employer and the borrowed employee.

The Workmen's Compensation Act defines an "employe" as follows:

§ 22. "Employe" defined

The term "employe", as used in this act is declared to be synonymous with servant, and includes—

All natural persons who perform services for another for a valuable consideration, exclusive of persons whose employment is casual in character and not in the regular course of the business of the employer, and exclusive of persons to whom articles or materials are given out to be made up, cleaned, washed, altered, ornamented, finished or repaired, or adapted for sale in the worker's own home, or on other premises, not under the control or management of the employer. Every executive officer of a corporation elected or appointed in accordance with the charter and by-laws of the corporation, except elected officers of the Commonwealth or any of its political subdivisions, shall be an employe of the corporation except as hereinafter provided in sections 302(c), 305 and 321.[1]

As amended 1956, Feb. 28, P.L. (1955) 1120, § 1; 1972 March 29, P.L. 159, No. 61, § 1, eff. May 1, 1972. 77 P.S. § 22.

The declaration that "employee" is "synonymous with servant" plainly manifests the legislature's intent that in determining the applicability of the Act, the common law test of employer and employee should be applied.

The common law test of a "special employer" and "special employee" was summarized by our Supreme Court as follows:

Where one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as a servant of the man to whom he is lent, although he remains the general servant of the person who lent him. . . . The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired.

*Puhlman v. Excelsior Express & Standard Cab Co.*, 259 Pa. 393, 397, 103 A. 218, 219 (1918).

In *Tarr v. Hecla Coal & Coke Co.*, 265 Pa. 519, 109 A. 224 (1920), the Court employed this common law test in determining the applicability of the Workmen's Compensation Act. The Court ruled that a coal mine worker who at the request of his employer consented to be temporarily employed by another mine company, was an employee of the "borrowing" mine company even though he was not promised any specific wage by the borrowing company and was under no binding contractual obligation to do work for it. *Id.*, 265 Pa. at 522, 109 A. 224. The Court did not resort to an "implied-in-fact" theory of contract to justify its conclusion, but cited and quoted the common law test as stated in *Puhlman. Id.*, 265 Pa. at 522, 109 A. 224.

In *Atherhold v. Stoddart Co.*, 286 Pa. 278, 133 A. 504, (1926), the Court held a corporation to be the employer under the Workmen's Compensation Act of a private chauffeur whose general employer was the corporation's chief executive when the chauffeur was instructed by the chief executive to do some work for the corporation. The corporation never paid the chauffeur nor was it under any contractual obligation to pay him. *Id.*, 286 Pa. at 279, 133 A.2d 505. The Court reasoned that the Workmen's Compensation Act

> in defining an employee as one who performs services for another for valuable consideration, does not specify that any particular person shall pay this consideration, and *its language is not to be construed as conditioning liability to meet a claim for compensation payment of wages by the person against whom the claim is made, or on the existence of an obligation to so pay wages.*

*Id.*, 286 Pa. at 280, 133 A.2d 504 (emphasis added).

In *Venezia v. Philadelphia Electric Co., supra,* the Court was asked to find an employment relationship under the Act in a factual setting similar to that of the present case. In *Venezia,* the plaintiff had been engaged as a common laborer by a labor contractor. Pursuant to a written contract to "furnish necessary labor for ditch excavation . . . when, if, and as required during the year 1931," the labor contractor

furnished the defendant with various laborers, including the plaintiff. The labor contractor paid the laborers after receiving from the defendant the amount of the labor contractor's payroll plus ten percent. *Id.*, 317 Pa. at 558, 177 A. at 26. As between the laborers and the defendant, no employment contract existed. The Court did not find this absence of an employment contract between the plaintiff as one of the laborers and the defendant to be a bar to a finding of an employment relationship between the two. The Court reasoned:

> The vital test in determining whether the workmen furnished by [the labor contractor] were servants of defendant is whether they are subject to its control or right of control not only with regard to the work to be done but also with regard to their manner of performing it. The payment of wages is not a decisive factor . . . *the act, in stating the term "employe" includes those who perform services for another "for a valuable consideration," does not specify that any particular person shall pay this consideration, and one may be the servant and employee of another, though hired and paid by a third person.*
>
> *Id.*, 317 Pa. at 559, 177 A. at 26 (citations omitted) (emphasis added).

Indeed, in many cases an employment relationship under the Act has been found without finding any separate contract between the "special employer" and the "borrowed employee." *See e. g., Mature v. Angelo*, 373 Pa. 593, 97 A.2d 59 (1953); *Hattler v. Wayne County*, 320 Pa. 280, 182 A. 526 (1936); *Persing v. Citizens Traction Co.*, 294 Pa. 230, 144 A. 97 (1928); *Robson v. Martin*, 291 Pa. 426, 140 A. 339 (1928); *Byrne v. Hitner's Son*, 290 Pa. 225, 138 A. 826 (1927); *Sgattone v. Mulholland & Gotwals, Inc.*, 290 Pa. 341, 138 A. 855 (1927); *Walton v. Harold M. Kelly, Inc.*, 218 Pa.Super. 28, 269 A.2d 347 (1970); *City of Monessen v. Workmen's Compensation Appeals Board, supra.*

When the decisions cited by English's administrator are carefully read, it will be seen that they are consistent with our conclusion that the law does not require that there must

have been a contract of hire, express or implied, between the Authority and English, before the Authority could be an employer within the Workmen's Compensation Act. Generally stated, the decisions involve the distinction between an individual working under some kind of contractual duty and an individual who is acting as a mere volunteer or simply for the "fun of it."

In *Harris v. Seiavitch, supra*, a ten year old boy was casually recruited off the street to ride on the tailgate of the defendant's truck to prevent other children from jumping on the back. In holding that the boy's parents could sue the defendant in trespass, the Supreme Court noted that while the boy was promised "something" in return for his services, *Id.*, 336 Pa. at 296, 9 A.2d at 376, it was "clearly apparent" that he went along with the defendant "for the fun of it," *Id.*, 336 Pa. at 298, 9 A.2d 375. In these circumstances the Court found no master-servant relationship between the defendant and the boy.

*Steward v. Uryc, supra*, is to the same affect. There, the defendant in operating a private sanitation business picked up and emptied his customers' trash containers. 237 Pa.Super. at 260, 352 A.2d at 467. During the summer, the plaintiff, a minor, occasionally rode on the defendant's truck to accompany him on his rounds. *Id.* In discussing the need for a contract of employment, this court stated that "[s]ome decisions treat this issue in terms of whether the employee was a 'volunteer,' in the sense of not performing services for a valuable consideration as required by the Act." 237 Pa. Super. at 263, 352 A.2d at 469. We then found that the minor plaintiff was a volunteer who assisted the defendant not because he sought compensation for regular employment but "because he enjoyed riding on the truck." *Id.*, 237 Pa.Super. at 267, 352 A.2d at 471.

Similarly, in both *Reasner v. Workmen's Compensation Appeals Board, supra*, and *Barr v. B & B Camper Sales, supra*, the Commonwealth Court considered whether an individual who performed work with an expectation of being compensated was an employee within the meaning of the

Act, even though there was no express contract between employer and employee. In both cases the court concluded that since the injured plaintiff was not a volunteer but had performed work with the expectation of receiving valuable consideration, he was covered by the Act. *See Reasner v. Workmen's Compensation Appeal's Board*, 36 Pa.Cmwlth. at 296, 387 A.2d at 682, and *Barr v. B & B Camper Sales*, 7 Pa.Cmwlth. at 328, 300 A.2d at 307.

In addition to these decisions, we note that it has been held that "candy-stripe" volunteers in hospitals are not employees within the meaning of the Workmen's Compensation Act because their services are not induced by valuable consideration. *Marcus v. Frankford Hospital*, 445 Pa. 206, 283 A.2d 69 (1971). *See also, Busch v. Bientzle*, 119 Pa.Super. 559, 181 A. 520 (1935).

Thus, the decisions, such as *Harris, Stewart, Barr, Reasner*, and *Marcus*, require only that the work undertaken be induced by consideration from *some* source, not that there be a bargained-for-exchange between the special employer and borrowed employee. Here, there is no question but that Thomas English was working at the Authority's metering station for valuable consideration.

(iii)

█ English's administrator and Wiesenberger argue that English could not have become an employee of the Authority for workmen's compensation purposes because he never "consented" to have the Authority as his employer. We agree that "a workman cannot be loaned to become the employee of another without the workman's consent." *Quick v. Allegheny Construction Equipment Co.*, 361 Pa. 377, 378, 65 A.2d 238, 239 (1949). It is apparent, however, that English did consent to become an employee of the Authority. This is so because what is required is that the employee consent to submit himself to the control and supervision of the borrowing employer, which English did. It was not required, as the argument to us seems to suggest, that the employee refer to the borrowing employer as "my employer."

An illustration of a situation where no employment relationship arose because of a lack of consent may be found in *Quick v. Allegheny Construction Equipment Co., supra,* where the facts were as follows. The plaintiff was employed as a fireman on a steam shovel owned by one Frank Albert. Albert sold the steam shovel to Allegheny Construction Equipment Co. on terms that required Allegheny to "get it where it stood." *Id.,* 361 Pa. at 378, 65 A.2d at 239. Since Allegheny had no qualified steam fireman, it requested Albert to lend it a fireman to help load the steam shovel onto a truck. Albert directed the plaintiff to act as fireman while the loading operation proceeded, and the plaintiff was injured when the steam shovel fell off the truck. The plaintiff testified at trial that he did not know at the time of the loading operation that Albert had sold the steam shovel to Allegheny and that it was pursuant to Allegheny's request that he was helping load it. In other words, the plaintiff did not know that his services were being performed for the benefit of Allegheny. In these circumstances, the Court was unwilling to hold that the plaintiff was a borrowed employee of Allegheny, for the plaintiff never had an opportunity to decide whether to accept or reject the transfer initiated by the two employers between themselves.

Here the situation was entirely different. Kelly Labor was in the business of lending out workers, and Thomas English knew it; it can hardly be suggested that English was unaware of the transfer from one employer to another that would take place when as a Kelly Worker he went from one job site to another.

English's administrator urges that because Charles Alley and Wayne Nagle indicated that they viewed their employer to be Kelly Labor even while they were working for the Authority, Kelly Workers—including English—never consented to be employees of the Authority. Brief for Appellant English at 17. However, just as the characterization of a claimant by an alleged employer does not control our determination of whether an employment relationship existed, *Stevens v. Publishers Agency,* 170 Pa.Super. 385, 85 A.2d

696 (1952), so the characterization of a borrowing employer by an employee does not control. The meaning of "employer" under the Act is controlled not by its popular, or lay, meaning, in which sense it may be understood by an individual employee, but rather by its legal meaning as reflected in the Act itself and the case law interpreting the Act.

### (iv)

Wiesenberger argues that the Authority should be estopped from denying that Kelly Labor was Thomas English's employer because in a resolution asking that condolences be sent to Wayne Nagle's and Thomas English's families, the Authority recited that Nagle and English "were employed by Kelly Labor Service to perform testing duties for the Lehigh County Authority." (R. 18(a).) This argument is without merit. For there to be an estoppel the party to be estopped must have induced the party asserting the estoppel to believe that certain facts existed that in truth did not exist, and the party asserting the estoppel must have acted in reliance on that belief. *Sabino v. Junio*, 441 Pa. 222, 272 A.2d 508 (1971); *Northwestern National Bank v. Commonwealth*, 345 Pa. 192, 27 A.2d 20 (1942). Here, the party asserting the estoppel—Wiesenberger—does not claim that *it* was induced by the Authority to believe anything, but rather that English's *administrator* was, and that "in reliance on [the Authority's] resolution, the [*administrator*] did not institute proceedings under the Workmen's Compensation [Act]. . . ." Brief for Appellant Wiesenberger at 9. All this says is that the administrator might have argued estoppel. However, he has not so argued.

### 2

Did Kelly Services violate any duty to Thomas English?

Kelly Services is a Delaware corporation with its home office in Detroit, Michigan. It grants franchises throughout the nation to concerns such as Kelly Labor. Wiesenberger alleges in its complaint joining Kelly Services as an additional defendant that Kelly Services is solely or jointly or severally liable for the death of Thomas English in that it

failed to warn its franchisee, Kelly Labor, of the hazardous nature of the work that English was assigned to do at the Authority's metering station. (Reproduced Record for Appellant Wiesenberger at 10(b).)

### A.

■ Kelly Services argues that Wiesenberger may not appeal the lower court's order granting Kelly Services' motion for summary judgment, on the theory, apparently, that English's administrator has not appealed that order. However, Rule 501 of Pa.R.A.P. states that "any party who is aggrieved by an appealable order ... may appeal therefrom," and Wiesenberger is plainly aggrieved by the lower court's order. As between them, Wiesenberger is plaintiff and Kelly Services is defendant. By granting Kelly Services' motion for summary judgment, the lower court put Wiesenberger, so far as its claims against Kelly Services are concerned, out of court.

### B.

■ The terms of the franchise agreement between Kelly Services and Kelly Labor require Kelly Services to provide "manuals and materials" to its various franchises. (R. 18b) Kelly Labor is required to adhere to the rules, methods, procedures, programs, policies, standards and ethics outlined in those manuals and materials. (R. 19b)

John F. Bliss, the manager of Kelly Labor, testified at his deposition that the manuals issued by Kelly Services included a list of hazardous work to which Kelly Services recommended that Kelly Labor not assign its workers. The list identified demolition, longshoreman's, and steeplejack work. Bliss Specifically stated that the list did not include sewage sampling work. (R. 39–40) He also testified that if a job came along that he knew nothing about he was instructed by Kelly Services to communicate with the home office in Detroit. (R. 40b) The following testimony then ensued:

Q. Did you know anything about obtaining sewerage samples and whether there were any problems, before you got this call from Lehigh Authority [requesting workers to perform the sewage sampling work]?

A. No, sir.

Q. When you got that call, did you check with anyone at the home office to see if there were any problems?

A. No, sir.

Angelo A. Agnello, the executive vice president of Kelly Services, testified at his deposition that Kelly Services attempted to discourage "high risk" work assignments by its various franchisees. He stated that Kelly Services would often do this by notifying the franchisees that its insurance department had determined on a cost-of-insuring basis that a given sort of work was "high risk" work. Agnello also testified that he knew that demolition, longshoreman's and steeplejack work were classified as "high risk," but that he did not know of any specific occupation classified as high risk because of noxious fumes in the work area. *Id.*

Robert Malkames, the sole shareholder of Kelly Labor, testified at his deposition that Kelly Services informed him that it did not want men on steeples or in deep trenches, and that warnings concerning such work were given orally to Kelly Labor's management. (R. 53b)

On the basis of this testimony Wiesenberger argues that Kelly Services should be held liable for the death of Thomas English because it supplied Kelly Labor with "incomplete or misleading" information. Brief for Appellant Wiesenberger at 16. In support of this argument Wiesenberger offers two theories. The first theory relies on the Restatement (Second) Torts, § 311, which states:

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results

(a) to the other, or

(b) to such third persons as the actor should expect to be put in peril by the action taken.

(2) Such negligence may consist of failure to exercise reasonable care

(a) in ascertaining the accuracy of the information, or

(b) in the manner in which it is communicated.

The second theory relies on the Restatement (Second) Torts § 324A, which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

### (i)

 Section 311 recognizes two different sorts of negligence: the failure to exercise reasonable care in ascertaining the accuracy of the information (§ 311(2)(a)), and the failure to exercise reasonable care in communicating the information (§ 311(2)(b)). The Reporter's notes illustrate these two sorts of negligence with the following examples:

8. The A Boiler Insurance Company undertakes as part of its services to inspect the boiler of B. It issues a certificate that the boiler is in good condition for use. In reliance upon this certificate, B uses the boiler. The boiler bursts, owing to a defect which a reasonably careful inspection would have disclosed. Explosion of the boiler wrecks the adjacent building of C and causes bodily harm to him. The A Company is subject to liability to C for his bodily harm and the wrecking of his building caused by the explosion of the boiler.

Illustration 8, Restatement (Second) Torts § 311.

9. The A Boiler Insurance Company undertakes as part of its service to inspect the boiler of B. The A Company makes a careful inspection, and correctly concludes that the boiler is unsafe. Through the negligence of its clerk,

it issues a certificate which, while correctly stating all the defects in the boiler, gives the misleading impression that the boiler is nevertheless safe. In reliance on the certificate, B continues to use the boiler, which bursts because of the defects and wrecks the adjacent building of C, causing bodily harm to C. The A Company is subject to liability to C for his bodily harm and the wrecking of his building. Illustration 9, Restatement (Second) Torts § 311.

Liability for either sort of negligence, however, is predicated on *the transmission of false information,* which the plaintiff reasonably relies on to his physical harm. Restatement (Second) Torts § 311. *See* Illustrations 1–9. Thus the rule states that "[o]ne who negligently *gives* false information to another," not that "[o]ne who negligently *fails to inform* another," is subject to liability. This is not to suggest that a failure to inform may not be actionable. It may be. Not, however, under Section 311; and only when the person failing to inform had a *duty* to inform. *See* Restatement (Second) Torts, § 284(b) and § 314. Liability under Section 311 may arise where even if a person did not have a duty to inform, he nevertheless did inform, and in doing so, transmitted false information.

Wiesenberger argues that Kelly Services should be found liable under Section 311(2)(a) because the information it sent Kelly Labor concerning "hazardous work" was *inaccurate in that it failed to include information* on the hazards of sewage sampling. Brief for Appellant Wiesenberger at 13–14. This argument misses the point of Section 311; for it asserts liability, not for "negligently giv[ing] false information," but for failing to give *any* information, about the hazards of sewage sampling. To be sure, if Kelly Services' failure to give any information about the hazards of sewage sampling had had the effect of rendering false the information it did give, liability might arise, but nothing suggests that that effect occurred. Similarly, Wiesenberger's argument that Kelly Services should be found liable under Section 311(2)(b) must be rejected. Liability does not arise because of the failure to exercise reasonable care "in the

manner in which [information] is communicated" unless the information communicated is false.

It may be added that Section 311 predicates liability on the receiver of information acting "in reasonable reliance upon such information." Nothing suggests any reliance by Kelly Labor on information received from Kelly Services in determining what was or was not hazardous work. Kelly Labor knew that the list of hazardous work was incomplete; John Bliss, Kelly Labor's manager, testified that Kelly Services had instructed him to communicate with the home office if a job came along that he knew nothing about. Bliss also testified that he had often gone to the work site of a new customer to insure that the Kelly Workers would not be doing dangerous work. (R. 42b) In any case, it would have been patently unreasonable for any labor agency to believe that a list identifying only demolition, longshoremen's, and steeplejack work as hazardous was a complete list.

### (ii)

Wiesenberger argues that Kelly Services should be found liable under a Section 324A theory of liability because it undertook "to warn Kelly Labor of high risk job classifications" and Kelly Labor relied on those classifications in determining which work assignments were safe for its worker, Thomas English. Brief for Appellant Wiesenberger at 15–16.

The difficulty with this argument is that the evidence shows that Kelly Labor did not rely on the advice of Kelly Services when it assigned English to work at the Authority's metering station, but instead, acted on its own initiative. Thus, Kelly Labor's manager, John Bliss, testified as follows:

Q. How about jobs that they [Kelly Services] don't list specifically, and which, I think you said, you have a question, you check with the home office, is that all it says in those manuals?

A. Right .... If there is any question in my mind before I send somebody out, I always go check with the employer and go out myself. I've had some

contractors call me for guys to work underground, to help lay pipe, and that I refused, too.

Q. Was there any question in your mind when the Lehigh County Authority called you that how this particular—

A. No, Sir. Especially when Doctor Warmkessel [an Authority employee] said it was an easy job.

R. 42b.

We should not, of course, affirm the lower court's order granting Kelly Services' motion for summary judgment if all that belied Wiesenberger's theory of its cause of action was a single witness's testimony contradicting a necessary element of that action. However, Wiesenberger has not pointed to any evidence at all that suggests that Kelly Labor relied on the advice or actions of Kelly Services in assigning its workers to the sewage sampling project.

The orders of the lower court granting the motions for summary judgment filed by Lehigh County Authority and Kelly Services, Inc., are affirmed. The appeals filed by Kelly Labor of Allentown, Inc., are quashed.