884 P.2d 832

Jerry RIVERA, Plaintiff–Appellant,

v.

SAGEBRUSH SALES, INC., a New Mexico corporation, and subsidiary of Fly–Gem Industries, a Delaware corporation, Defendant–Appellee.

No. 14724.

Court of Appeals of New Mexico.

Aug. 26, 1994.

Certiorari Denied Sept. 30, 1994.

Charles R. Finley, Warner & Finley, Albuquerque, for plaintiff-appellant.

James C. Ritchie, Edward Ricco, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for defendant-appellee.

## OPINION

PICKARD, Judge.

We grant the motion for rehearing, withdraw the prior opinion, and substitute the following.

This case requires us to determine whether Defendant, Sagebrush Sales, Inc. (Sagebrush), was Plaintiff's (Rivera) employer for purposes of the Workers' Compensation Act (the Act). Madden Temporary Services, Inc. (Madden), was Rivera's direct employer and had a contract with Sagebrush to provide temporary workers to Sagebrush on an as-needed basis. Rivera was injured while tagging lumber for Sagebrush at its lumberyard. After Rivera's on-the-job injury, Madden and its insurer paid Rivera's workers' compensation benefits. Rivera then sued Sagebrush for personal injuries resulting from Sagebrush's alleged negligence. Sagebrush moved for summary judgment, claiming Rivera's suit was barred by the exclusivity provisions of the Act. See NMSA 1978, §§ 52–1–8 and –9 (Repl.Pamp.1991). The district court granted summary judgment, and Rivera appeals. We affirm.

The Act provides that any employer who complies with the Act relating to insurance is not subject to any other liability except as provided in the Act. Section 52–1–8. This

provision also abolishes all causes of action against the employer for personal injury to the employee except as provided in the Act. *Id.* The questions we must decide are whether there is any genuine issue of material fact concerning whether Sagebrush was Rivera's employer for the purposes of the Act and whether Sagebrush is entitled to judgment as a matter of law. *See Garcia v. Smith Pipe & Steel Co.,* 107 N.M. 808, 809, 765 P.2d 1176, 1177 (Ct.App.), *cert. denied,* 107 N.M. 673, 763 P.2d 689 (1988).

■ Initially, we address Rivera's argument that Sagebrush waived its right to rely on the exclusivity provisions of the Act. Rivera argues that Sagebrush waived its right based on its contract with Madden. *See Matkins v. Zero Refrigerated Lines, Inc.,* 93 N.M. 511, 513–16, 602 P.2d 195, 197–200 (Ct. App.1979). The parties agree that the contract consists of two documents. One, a one-page letter from Madden to Sagebrush, indicates among other things that the hourly rates Madden charged Sagebrush included payment for payroll taxes, unemployment compensation, and workers' compensation insurance. The second is a one-page document signed by Madden and Sagebrush that provides, expressly in light of the above, that Sagebrush "will be in no way responsible" for any injury suffered by a Madden employee on the job at Sagebrush.

In *Matkins,* the worker was the employee of a truck company that had entered into a lease agreement with a licensed interstate common carrier. The contract between the truck company and common carrier provided that the common carrier was not responsible for workers' compensation insurance for the truck company or its drivers, helpers, or laborers and that "[s]uch matters are the sole and exclusive responsibility and liability" of the truck company. *Id.* at 514, 602 P.2d at 198. In the present case, however, the contract between Sagebrush and Madden did not absolve Sagebrush of responsibility for workers' compensation coverage and, in fact, provided that the amount Sagebrush paid to Madden would include the cost of providing this coverage. Therefore, unlike the common carrier in *Matkins,* Sagebrush has not relinquished the right to invoke the exclusivi-

ty provisions of the Act. Consequently, this case is appropriately analyzed, from the perspective of the purposes of the Act, under the usual rules governing employer-employee relationships.

It is to those rules that we now turn. We focus on the determination of whether Sagebrush was Rivera's employer for purposes of the Act. Although Sagebrush has argued, both below and on appeal, that it is Rivera's statutory employer under NMSA 1978, Section 52–1–22 (Repl.Pamp.1991), the cases that it relied on, both below and on appeal, are special- or borrowed-employee cases. We directed the parties' attention to the distinction between statutory and special employees and held oral argument in this matter. We learned that the distinction is a matter of some confusion within the practicing bar, with some people taking the position that there is no distinction and that borrowed employees are just one sort of statutory employee. We disagree with this position and take this opportunity to sort out the different types of employees, the special rules applicable to each, and the situations to which the special rules apply. We first address special or borrowed employees, which we believe is the concept that applies to this case. We conclude with a discussion of the concept of statutory employees.

■ There is no dispute that Madden was Rivera's direct or general employer. Under the undisputed facts of this case, we conclude that Sagebrush was Rivera's special employer at the time of the accidental injury. *See* 1B Arthur Larson, The Law of Workmen's Compensation § 48.23, at 8–515 to –532 (1993) (hereinafter Larson) (when the general employer merely arranges for labor for another entity, without providing heavy equipment, the worker generally becomes a special employee of the other entity). Under certain conditions, both the general and special employer are liable for workers' compensation. *See* Larson, *supra,* § 48.00, at 8–434. The special employer is liable when:

(1) the employee has made a contract of hire, express or implied, with the special employer;

(2) the work being done is essentially that of the special employer; and

(3) the special employer has the right to control the details of the work.

*Id.* *See Johnson v. Aztec Well Servicing, Inc.,* 117 N.M. 697, 699, 875 P.2d 1128, 1130 (Ct.App.1994). *See also Wuertz v. Howard,* 77 N.M. 228, 421 P.2d 441 (1966); *Shipman v. Macco Corp.,* 74 N.M. 174, 178, 392 P.2d 9, 11–12 (1964).

■ In determining whether the employee has made a contract of hire with the special employer, the employee must have consented to the employment relationship. *See* Larson, *supra,* §§ 48.11 & 48.12, at 8–434 to –445. In the present case, there is no dispute that Rivera accepted the assignment from Madden to work for Sagebrush. This undisputed fact is sufficient to establish as a matter of law an implied contract of hire existed between Rivera and Sagebrush. *See* Larson, *supra,* § 48.15, 8–464 to –470. *See, e.g., Antheunisse v. Tiffany & Co.,* 229 N.J.Super. 399, 551 A.2d 1006, 1008 (App. Div.1988) (worker knew she would be hired out to various employers and impliedly contracted with the special employer when she voluntarily reported to work and followed the instructions of the special employer), *cert. denied,* 115 N.J. 59, 556 A.2d 1206 (1989); *Santa Cruz Poultry, Inc. v. Superior Ct.,* 194 Cal.App.3d 575, 239 Cal.Rptr. 578, 580, 582–83 (1987) (special employer's control over worker's job performance implies, as a matter of law, the employment relationship between them); *English v. Lehigh County Auth.,* 286 Pa.Super. 312, 428 A.2d 1343, 1353–54 (1981) (consent to employment demonstrated by worker's submitting himself to the control and supervision of the special employer); *Wright v. Habco, Inc.,* 419 S.W.2d 34, 36 (Mo.1967) (fact that worker entered into employment relationship with a labor broker constituted consent to work for special employers; worker also had gone to special employer's premises and worked under its supervision for several weeks before the accidental injury); *see also Jelso v. World Balloon Corp.,* 97 N.M. 164, 167, 637 P.2d 846, 849 (Ct.App.1981) (whether the status of an employer-employee relationship exists is a question of law if the material facts are undisputed).

In this connection, *Guerrero v. Standard Alloys Manufacturing Co.,* 566 S.W.2d 100 (Tex.Civ.App.1978), relied on by Rivera, is distinguishable. In that case, the plaintiff did not speak English, and the defendant's supervisors did not speak Spanish. The labor broker stopped at plaintiff's work site several times a week to supervise the work. These facts among others raised a question of fact as to who was the employer. The facts are not at all similar in this case.

■ The fact that Rivera's affidavit asserted that he had no employment contract with Sagebrush and that he had not been told he would be considered Sagebrush's employee for purposes of the Act does not change this result. *See, e.g., English,* 428 A.2d at 1354 (characterization of relationship by worker or employer does not control determination of whether employment relationship exists). Similarly, Sagebrush's interrogatory answer stating that it did not have a written or oral employment contract with Rivera does not create a genuine issue of material fact. *See id.; Whitehead v. Safeway Steel Prods., Inc.,* 304 Md. 67, 497 A.2d 803, 812 (1985) (special employer's answer to interrogatory that failed to list worker as an employee was not dispositive of legal question concerning existence of employment relationship, which depended on worker's submission to the control of the special employer).

The work that Rivera was doing, tagging lumber, was clearly the work of Sagebrush, which was in the lumberyard business, as opposed to the work of Madden, which was in the business of recruiting and supplying temporary laborers. Rivera's complaint alleged that he was injured when an employee of Sagebrush instructed him to step on a forklift operated by an employee of Sagebrush in order to tag a stack of lumber on a flatbed truck. There was evidence that Sagebrush was training Rivera as a tally man to tag the lumber and had told Rivera where to locate the lumber that needed tagging. Rivera's affidavit stated that he "was usually allowed to work alone" and tag the lumber without help or supervision. However, this does not create a genuine issue of material fact on this point since it only indicates that the type of work Rivera was performing did not require

the continual exercise of Sagebrush's right to control the details of the work. *See English,* 428 A.2d at 1350. Also, although Sagebrush could not fire Rivera from Madden's employment, Sagebrush had the right to replace any unsatisfactory worker that Madden had supplied. *See, e.g., Antheunisse,* 551 A.2d at 1008. Sagebrush, therefore, had the right to control the details of Rivera's work.

Under these facts, Sagebrush was Rivera's special employer and was liable for workers' compensation. Since Sagebrush provided for workers' compensation coverage through its contract with Madden, it complied with the Act and Rivera's cause of action for personal injury is barred. *See Garcia,* 107 N.M. at 808, 765 P.2d at 1176. Moreover, this result is entirely appropriate. As pointed out by the California Court of Appeal in *Santa Cruz Poultry,* 239 Cal.Rptr. at 583, it is the employee's receipt of the quid pro quo—workers' compensation coverage with its attendant quick recovery and simplified procedures—which justifies the loss of the right to bring a tort case. Here, Rivera received the quid pro quo in part through Sagebrush's efforts to insure that Madden employees would be compensated through the worker's compensation system. More importantly, however, Rivera's situation meets the three-part Larson test. The fact that Rivera may have multiple employers is irrelevant. The exclusivity of compensation rests on the existence of the employment relationship. *Id.*

■ To the extent that the parties argue whether Sagebrush was Rivera's statutory employer, *see* § 52–1–22, we find this statute to be inapplicable to the facts of this case. Although "statutory employer" or "contractor under" statutes serve a similar purpose to some of the policies relied on in the borrowed- or special-employee case, i.e., to give the general contractor incentive to encourage the subcontractor to provide workers' compensation insurance, *see* 2A Larson, *supra,* § 72.31(b) at 14–231, Section 52–1–22 does not apply in this case. Section 52–1–22 states:

> As used in the Workmen's Compensation Act, unless the context otherwise requires, where any employer procures any work to be done wholly or in part for him, by a contractor other than an independent contractor, and the work so procured to be done is a part or process in the trade or business or undertaking of such employer, then such employer shall be liable to pay all compensation under the Workmen's Compensation Act to the same extent as if the work were done without the intervention of such contractor. And the work so procured to be done shall not be construed to be "casual employment."

■ As noted by Larson, the chief function of this statute is to address the prime contractor-subcontractor situation. For this statute to apply, (1) the employer must procure work to be done by a contractor other than an independent contractor and (2) the work must be a part of the trade or business of the employer.

In analyzing the present situation, it is important to distinguish between two types of work. The first is the work performed by Rivera—the actual lumberyard operation. The second is the work performed by Madden—recruiting, interviewing, and hiring workers. Both types of work could be considered as part of Sagebrush's trade or business.

■ For purposes of Section 52–1–22, however, what matters is the work performed by Madden, not the work performed by Rivera. As we stated in *Quintana v. University of California,* 111 N.M. 679, 681, 808 P.2d 964, 966 (Ct.App.), *cert. denied,* 111 N.M. 678, 808 P.2d 963 (1991), "[I]t is the relationship between the general contractor and the employer of the claimant that is dispositive and not the relationship between the general contractor and the claimant." Looking at the Sagebrush–Madden relationship, it is apparent that Madden was an independent contractor. Sagebrush did not control or have the right to control the details of how Madden recruited, interviewed, or hired the workers. Therefore, the statutory-employer provision does not apply.

■ With respect to the work performed by Rivera—the lumberyard operation—we agree with the analysis of the Arizona Supreme Court. In *Word v. Motorola, Inc.,* 135 Ariz. 517, 662 P.2d 1024 (1983) (en

banc), the court outlined the difference between borrowed servants and statutory employees. According to *Word*, the statutory-employer doctrine governs only situations in which an employer procures work to be done for him by a contractor. *Id.* Although the statutory-employee and borrowed- or special-employee doctrines both provide employers with immunity from common law actions, the statutory-employee type of immunity does not apply if the true relationship is that of lent employee. *Word*, 662 P.2d at 1027. The Arizona court described the distinction as follows:

> The statutory employer doctrine governs only situations in which an "employer [owner or general contractor, for example] procures work to be done for him by a contractor...." A.R.S. § 23–902(B). Here, Motorola did not procure work to be done by Paramount. It undertook to perform the work itself, through its employees, and procured plaintiff and additional temporary employees from Paramount and other labor contractors. Paramount did not "do work" for Motorola, it merely supplied ("lent") its employees to Motorola. The issue in this case, therefore, was not whether Motorola was a statutory employer under § 23–902(B), but whether Motorola was actually plaintiff's employer under the lent employee doctrine.

662 P.2d at 1026.

In the present case, the same may be said. Sagebrush undertook to do its own work through its own employees and temporary workers supplied by Madden. It did not contract with Madden to run the lumberyard, but simply to supply it with temporary laborers whom Sagebrush would direct in performing the work of the lumberyard. *Compare Shipman* (a borrowed- or special-employee case in which the worker who was furnished by a labor broker was the employee of defendant, a contractor with the federal government) *with Quintana* (a statutory-employer case in which the general contractor, which was in the business of operating a national laboratory, was a statutory employer based on its contract with the subcontractor detailing the performance of various support functions in that operation, such as manage-ment, administration, construction, maintenance, custodial, and other essential services). *See also* 2A Larson, *supra*, § 72.31(d).

*Word* was correct in its basic holding that the statutory-employer provision is simply not intended or designed to deal with injuries to workers supplied by labor suppliers while doing the regular work of the contracting employer. *See Word*, 662 P.2d at 1027. That holding applies to this case. Future cases involving statutory employers, however, must be analyzed in terms of the dual test of Section 52–1–22 from the perspective of the relationship between the contracting employer and the employer of claimant as well as the perspective of the type of work being done. When analyzing the relationship between the contracting employer and the claimant him- or herself, the issue will generally not be whether the contracting employer is a statutory employer, but rather whether the contracting employer is a special employer, a borrowing employer, or a regular employer.

In this case, although Sagebrush relied on what it called the statutory-employee doctrine, the cases and facts cited to the district court by both parties were most relevant to the borrowed- or special-employee doctrine. The parties have agreed that the facts elicited on discovery were equally relevant to either doctrine and that no further discovery would reveal facts relevant to the doctrine we hold to be applicable. Under the facts of this case, Sagebrush was Rivera's special employer and, because Sagebrush had provided for workers' compensation coverage, Rivera is barred from asserting his negligence claim against Sagebrush.

We therefore affirm the district court's grant of summary judgment.

IT IS SO ORDERED.

HARTZ and BLACK, JJ., concur.