888 P.2d 940

**Eloy R. ROMERO, Worker–Appellant,**

v.

**SHUMATE CONSTRUCTORS, INC. and Transamerica Insurance Group, and Fay's Painting Company, and United States Fidelity & Guaranty Company, Respondents–Insurers–Appellees.**

Nos. 15325, 15426.

Court of Appeals of New Mexico.

Oct. 21, 1994.

Certiorari Granted Jan. 9, 1995.

Donald M. Pinnock, Will Ferguson & Associates, Albuquerque, for worker-appellant.

Gary J. Cade, Civerolo, Wolf, Gralow & Hill, P.A., Albuquerque, for Shumate Constructors, Inc. and Transamerica Ins. Group.

Manuel Garcia, Jr., Albuquerque, for Fay's Painting Co.

Thomas R. Mack, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, for U.S. Fidelity Guar. & Co.

## OPINION

BIVINS, Judge.

We consolidated these appeals to consider NMSA 1978, Section 52–1–22 (Repl. Pamp.1991), sometimes referred to as the "statutory-employer" or "contractor-under" provision of the Workers' Compensation Act, NMSA 1978, Section 52–1–1 to –70 (Repl. Pamp.1991). In the first case on appeal, *Romero v. Shumate Constructors, Inc.*, a workers' compensation case, the Administrative Law Judge (ALJ) granted summary judgment in favor of the general contractor, Shumate Constructors, Inc. (Shumate), and its carrier. The ALJ determined that Romero's immediate employer, Fay's Painting Company (Fay's), was an independent contractor, and therefore Shumate was not liable to pay compensation benefits to Romero. Romero appeals that ruling. In the second case on appeal, *Harger v. Structural Services, Inc.*, a common law tort action, Harger

sued Jaynes Corporation (Jaynes), the primary contractor, and Structural Services, Inc. (SSI), a subcontractor, for personal injuries suffered while Harger was working for another subcontractor, Superior Mechanical Contractors, Inc. (Superior). The district court of Bernalillo County granted summary judgment in favor of Jaynes and SSI. The court determined Jaynes to be a statutory employer and thus immune from suit. SSI was determined to be a co-employee of Harger and also immune. Because different results occurred under similar facts in these two cases and because of the confusion emanating from the statutory-employer provision, we consolidated these appeals in order to revisit this enigmatic section of the Workers' Compensation Act.

## FACTS

In *Romero*, Shumate was the general contractor in the construction and renovation of several primary clarifier units at the City of Albuquerque's wastewater treatment plant. Shumate hired and entered into a written contract with Fay's to sandblast and apply protective coatings to those clarifier units. Shumate never engages in sandblasting or coating on wastewater treatment projects, but rather uses subcontractors to do such work when necessary.

Romero was an employee of Fay's. He alleges that he was injured in the course and scope of his employment. Shumate required Fay's to carry workers' compensation insurance and other insurance for its workers. Fay's provided Shumate with a certificate of insurance, but Romero alleges that Fay's did not actually carry workers' compensation insurance. The question of whether Fay's carried workers' compensation insurance was unresolved at the time Shumate was granted summary judgment, and we have not been informed of any subsequent resolution of this issue.

While Shumate made a lump-sum payment of $84,708 to Fay's and did not specify how many workers there would be or how much each worker would be paid, the contract required Fay's to pay a certain scale of wages and to use any payment by Shumate to pay for labor and materials before spending it elsewhere. In addition, the contract re-quired Fay's to use only its own equipment unless it received permission from Shumate. The contract also required Fay's to follow Shumate's safety policy, which included the requirement to leave safety equipment in place. Shumate also reserved the right to clean up the project site if Fay's failed to do so, and it could charge Fay's if it had to do the cleanup.

In *Harger*, Jaynes was the general contractor on the construction of a school in Zuni, New Mexico. Superior subcontracted with Jaynes to perform mechanical work on the school, and SSI was Jaynes's structural steel subcontractor on the project. Harger was employed by Superior and was injured in the course of his employment by a steel beam that SSI was moving at the time. Jaynes required Superior to carry workers' compensation insurance, and Superior did so. At the time Jaynes and Superior entered their contract, Superior already had workers' compensation insurance.

The contract between Jaynes and Superior specifically referred to Superior as an independent contractor. It also required Superior to furnish its own labor, materials, and equipment for its work on the project. The contract price was a lump sum of $227,262. Furthermore, Harger alleges that Superior had control over its own employees, had the power to hire and fire Harger, and paid Harger an hourly salary. On the other hand, the contract required Superior to clean up the site. If Superior failed to do so, Jaynes was permitted to do the cleanup and charge Superior for the work. The contract also required Superior to complete its work according to a schedule set and modifiable by Jaynes and to coordinate its activities with Jaynes and all other employees and subcontractors of Jaynes. As was the case with Shumate in *Romero*, Superior was contractually required to follow safety measures established by Jaynes and those mandated by state and federal law. Finally, if Superior "fail[ed] to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or it fail[ed] to make prompt payment for its workers, ... disregard[ed] laws, ordinances, rules, regulations or orders of any public authority having jur-

isdiction," Jaynes could supply workers or other subcontractors to perform a portion of Superior's work or terminate the contract after expiration of a period of time within which Superior could cure its default. If Jaynes chose to terminate the contract, it could use Superior's equipment and materials to complete the project.

*DISCUSSION*

The questions we consider here are: (1) whether the concept of "casual employment" as referred to in Section 52–1–22 is relevant to the disposition of these cases; (2) whether summary judgment as to the existence or non-existence of a statutory-employment relationship was proper in either *Romero* or *Harger;* and (3) whether summary judgment that SSI was Harger's co-employee was proper.

I. *Casual Employment*

Section 52–1–22, captioned "Work not casual employment," provides:

> As used in the Workers' Compensation Act [this article], unless the context otherwise requires, where any employer procures any work to be done wholly or in part for him by a contractor other than an independent contractor and the work so procured to be done is a part or process in the trade or business or undertaking of such employer, then such employer shall be liable to pay all compensation under the Workers' Compensation Act to the same extent as if the work were done without the intervention of such contractor. *The work so procured to be done shall not be construed to be "casual employment."* (Emphasis added.)

■ Shumate argues that the work done by Romero was casual employment as to Shumate, and that Romero was therefore not a statutory employee of Shumate. Part of the confusion in applying this section arises, we believe, because of the caption and the last sentence of Section 52–1–22. Ignoring that caption and sentence for the moment, the remaining language of the section (one sentence) deals with circumstances in which an employer of a subcontractor shall become liable to pay workers' compensation benefits under the Workers' Compensation Act. As

we stated in *Quintana v. University of California,* 111 N.M. 679, 681, 808 P.2d 964, 966 (Ct.App.), *cert. denied,* 111 N.M. 678, 808 P.2d 963 (1991), "it is the relationship between the general contractor and the employer of the claimant [worker] that is dispositive [of whether the general contractor is a statutory employer] and not the relationship between the general contractor and the claimant." *See also Rivera v. Sagebrush Sales, Inc.,* 118 N.M. 676, 680, 884 P.2d 832, 836 (Ct.App.1994). "Casual employment," in contrast, ordinarily deals with the relationship between the claimant's alleged immediate employer and the claimant. *See generally* § 52–1–16(A) and –23; 1C Arthur Larson, *The Law of Workmen's Compensation* § 51.00–51.23 (1993).

■ As we see it, the purpose of the sentence on casual employment is to make clear that, once the two key requirements of statutory employment under Section 52–1–22 are met, i.e., that (1) the subcontractor in question is not an independent contractor and (2) the subcontractor's work is "part or process in the trade or business or undertaking" of the general contractor, *see Quintana,* 111 N.M. at 681, 808 P.2d at 966, such work will not be deemed casual employment as to the general contractor for purposes of Sections 52–1–16(A) and –23. In case the reader had any doubt about the consistency of the statutory-employer provision and the rest of the Act, that doubt should be laid to rest by the sentence on casual employment. In the two appeals before us, therefore, we need not be concerned with casual employment, but rather with the above-mentioned two requirements of the statutory-employer provision.

II. *Statutory–Employer Provision*

The parties in the respective cases seem to agree that Romero was an employee of Fay's and that Harger was an employee of Superior. In *Romero,* Worker seeks compensation benefits from Shumate, the general contractor and employer of Fay's. Romero sued Shumate because Fay's may not have carried workers' compensation insurance. In *Harger,* Worker obtained compensation benefits from his principal employer, Superior, and

now seeks damages through a tort action against Jaynes, the general contractor and employer of Superior, and another subcontractor, SSI. The issues that surround these two actions reflect the dual purpose of the statutory-employer provision.

### A. Dual Purpose of Section 52–1–22

■ The primary purpose of the statutory-employer provision is to make the general or prime contractor liable for compensation benefits to employees of its subcontractor. This provision is usually invoked when the subcontractor is uninsured. *See* 2A Larson, *supra*, § 72.31(a). Romero sought to benefit from this provision in the event his principal employer is determined to be uninsured. The second function of the statute is to allow a general or prime contractor who qualifies as a statutory employer to take refuge under the Workers' Compensation Act's exclusivity provision, which makes it immune from a tort action. *See* § 52–1–8; *Quintana*, 111 N.M. at 681, 808 P.2d at 966; 2A Larson, *supra*, §§ 72.31(a), (b). In *Harger*, the general contractor, Jaynes, sought to take advantage of that benefit. Similarly, SSI, a subcontractor, also sought refuge from the suit as a co-employee under the exclusivity provision of the Act.

■ Although such exclusivity provisions have traditionally been applied only to situations in which the subcontractor is uninsured, there is a significant trend toward granting immunity in cases where the subcontractor *is* insured and even where the worker has received benefits under the subcontractor's policy. *Id.* § 72.31(b), at 14–209 to ‑224. The rationale behind this trend is that the general contractor retains a back-up liability for workers' compensation benefits as a means of encouraging it to ensure that its subcontractors maintain their insurance coverage. *See id.* at 14–231 to ‑238. *Quintana* went part of the way toward adopting this trend by holding that general contractors who qualify as statutory employers are immune if they contractually assure insurance coverage to employees of the subcontractor. *Quintana*, 111 N.M. at 682, 808 P.2d at 967. *See also Rivera*, 118 N.M. at 680–681, 884 P.2d at 836–37.

Jaynes did contractually assure such coverage. Therefore, if Jaynes was a statutory employer, it was also immune from suit in tort by Harger. Harger asks that we narrow the statutory-employer doctrine to provide immunity only to employers who actually pay workers' compensation benefits. In light of the Larson rationale and the holding in *Quintana*, we decline to do this. We point out that, in deciding these cases, we need not go as far as Larson seems to suggest, although *Rivera* appeared to do that in dicta. *Rivera*, 118 N.M. at 680–681, 884 P.2d at 836–37. We leave for another day the question of whether a statutory employer who does *not* contractually assure coverage to employees of its subcontractor is nonetheless immune under the exclusivity provision of the Act.

### B. Requirement that Subcontractor not be Independent

This Court has struggled with the distinction between an employee and an independent contractor, but cases that have addressed this distinction have generally not involved the relationship between a general contractor and a subcontractor for purposes of determining whether the employee of the subcontractor was a statutory employee of the general contractor. *Yerbich v. Heald*, 89 N.M. 67, 547 P.2d 72 (Ct.App.1976), was one such case, and it established a two-prong test for determining the existence of an independent-contractor status: (1) whether the employer has the right to control the purported employee; and (2) whether the work being done is "an integral part of the employer's business." *Id.* at 69, 547 P.2d at 74. Less than five months after *Yerbich* was decided, *Burton v. Crawford & Co.*, 89 N.M. 436, 553 P.2d 716 (Ct.App.), *cert. denied*, 90 N.M. 7, 558 P.2d 619 (1976), without mentioning *Yerbich* at all, adopted a more complex test to determine independent-contractor status. Because the *Burton* court believed that the right-to-control test had lost its precision as applied to the distinction between employee and independent contractor and because the test had been criticized by Larson, the court adopted Larson's "relative nature of the work" test to use in its place. *Id.* at 439–40,

553 P.2d at 719–20; *see also* 1B Larson, *supra,* §§ 43.42–43.54. This test was explained as follows:

> The "relative nature of the work" test has two parts: first, the character of the claimant's work or business; and second, the relationship of the claimant's work or business to the purported employer's business.... With reference to the character of claimant's work or business the factors are: (a) the degree of skill involved; (b) the degree to which it is a separate calling or business; and (c) the extent to which it can be expected to carry its own accident burden. The relationship of the claimant's work or business to the purported employer's business requires consideration of[:] (a) the extent to which claimant's work is a regular part of the employer's regular work; (b) whether claimant's work is continuous or intermittent; and (c) whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of the particular job.

*Burton,* 89 N.M. at 440, 553 P.2d at 720 (quoting *Ostrem v. Alaska Workmen's Compensation Board,* 511 P.2d 1061, 1063 (Alaska 1973)); *see also* 1B Larson, *supra,* § 43.52, at 8–27 to –28.

Unlike *Yerbich, Burton* did weave into its opinion the predecessor provision to Section 52-1-22, but it referred to that provision only as a prelude to setting forth the several "avenues" for distinguishing employees from independent contractors. *Burton,* 89 N.M. at 438, 553 P.2d at 718. Like *Yerbich,* the purported employee in *Burton* was not a subcontractor.

*Dibble v. Garcia,* 98 N.M. 21, 644 P.2d 535 (Ct.App.), *cert. denied,* 98 N.M. 50, 644 P.2d 1039 (1982), was yet another case that grappled with the distinction between employee and independent contractor for purposes of workers' compensation. There the court used four tests: (1) the conventional-relationship test; (2) the right-to-control test; (3) the "right to employ and discharge at will" test; and (4) the "relative nature of the work" test. *Id.* 98 N.M. at 24–25, 644 P.2d at 538–39. The court determined that under each test there was substantial evidence that the plaintiff was an independent contractor. *Id.* However, it is not clear whether the court was suggesting that it was sufficient to use any one of the four tests in making the determination or if more than one would be necessary. The plaintiff in *Tafoya v. Casa Vieja, Inc.,* 104 N.M. 775, 727 P.2d 83 (Ct. App.1986), was also determined to be an independent contractor, but under the *Yerbich* test. *Tafoya,* 104 N.M. at 776–78, 727 P.2d at 84–86. It is not clear if it was necessary for both prongs of *Yerbich* to be satisfied for the plaintiff to be deemed an independent contractor.

The *Tafoya* court referred to the second prong of the *Yerbich* test as the "relative nature of the work test", *Tafoya,* 104 N.M. at 777, 727 P.2d at 85, but this language unfortunately blurs the distinction between *Yerbich* and the relative-nature test as set forth in *Burton* and Larson. Neither *Dibble* nor *Tafoya* involved employees of a subcontractor in relation to the general contractor or consideration of the statutory-employer provision, nor does any other case cited by Shumate and Harger in support of their interpretation of independent-contractor status, with the sole exception of *Quintana.*

*Quintana* sought to apply the *Yerbich* test to a situation where the existence of statutory employment *was* in question, and the court concluded that the two prongs of this test were functionally equivalent to the two requirements of Section 52-1-22. *Quintana,* 111 N.M. at 681–82, 808 P.2d at 966–67. However, in doing so, *Quintana* relied on the *Tafoya* court's mislabelling of the second prong of the *Yerbich* test as "the relative nature of the work" test. *Quintana,* 111 N.M. at 681–82, 808 P.2d at 966–67. Perhaps because the outcome of *Quintana* turned in large part on a procedural question relating to the dismissal of the complaint (which was deemed to be the equivalent of a grant of summary judgment), *see id.* at 681–83, 808 P.2d at 966–68, the court did not find it necessary to show clearly how it applied *Yerbich* to the facts of the case, and it is not clear if the court used the "relative nature" test as set forth in *Burton* and Larson rather than the second prong of *Yerbich.* It is our task, therefore, to clarify the test of indepen-

dent-contractor status as applied to Section 52–1–22.

If the *Quintana* court truly meant to use the *Yerbich* test not as a test of independent-contractor status alone, but rather as a substitute for the two requirements of Section 52–1–22, then it would seem that the right-to-control prong of the test would *be* the test of independent-contractor status, while the "integral part of the business" prong would be a substitute wording for the "part or process" requirement of Section 52–1–22. This would leave out the "relative nature" test entirely. On the other hand, if *Quintana* did mean to use the "relative nature" test, it either used that test as part of the determination of independent-contractor status, in which case it bypassed the "part or process" requirement, or it used the "relative nature" test instead of the "part or process" requirement. Neither possibility squares with what we believe to be the intent of Section 52–1–22. Regarding the latter possibility, we point out that Larson's discussion of the relative nature test refers, as in *Burton, Dibble,* and *Tafoya,* to the determination of actual rather than statutory employment, and is considerably more complex in its calculus than the "part or process" test, which is commonly found in statutory-employer provisions. *See* 1B Larson, *supra,* §§ 43.50–43.54 (distinguishing employee from independent contractor); 1C Larson, *supra,* §§ 49.16(a)–(j) (what constitutes a statutory employer—part of the category of "Inclusions and Exemptions"). That brings us back to the question of whether to apply the right-to-control test or the relative-nature test or both in determining independent-contractor status in the context of statutory employment.

▪ Part of the difficulty in deciding which test to choose or what test to fashion is that the common-law test of independence is aimed at an interest that is different from that addressed by the Workers' Compensation Act. In the common-law situation, we apply the right-to-control test to determine if an employer should be held vicariously liable for the negligent acts of its employees. *See* SCRA 1986, 13–404 (Repl.Pamp.1991); *Savinsky v. Bromley Group, Ltd.,* 106 N.M. 175, 740 P.2d 1159 (Ct.App.), *cert. denied,*

106 N.M. 174, 740 P.2d 1158 (1987). If the employee is found to be an independent contractor, then the employer is not liable. On the other hand, the question under the Workers' Compensation Act is entitlement to benefits. Specifically, under Section 52–1–22, we seek to determine if the employer of a subcontractor is responsible for workers' compensation benefits to employees of the subcontractor. As already noted, the statutory-employer provision is usually invoked by a worker when the subcontractor is uninsured. *See* 2A Larson, *supra,* § 72.31(a), at 14–197 to –198. Under that provision, if the subcontractor is found not to be an independent contractor and the work so procured to be done was part or process in the trade or business or undertaking of the general contractor, then the general contractor is liable to pay compensation benefits to the subcontractor's employee as if that employee were an employee of the general contractor. This comparison raises the question of whether "independent contractor" as used in Section 52–1–22 means something different from "independent contractor" as used at common law. Romero argues that the term has different meanings in the two contexts. We agree.

▪ In keeping with the basic purpose of the Workers' Compensation Act, which is to ensure that the industry carry the burden of compensating injuries suffered by workers in the course of employment, *Yerbich,* 89 N.M. at 68–69, 547 P.2d at 73–74, we believe that the legislature intended a narrower class of employers to escape workers' compensation liability than can escape vicarious tort liability under the common law. *See* 1B Larson, *supra,* § 43.42. Professor Larson observes that

a recognition of the difference between compensation law and vicarious liability in the purpose and function of the employment concept has been reflected both in statutory extensions of the term "employee" beyond the common-law concept and in a gradual broadening of the interpretation of the term to bring within compensation coverage borderline classes for whom compensation protection is appropriate and practical.

*Id.* § 43.00, at 8–1. He goes on to say that the common-law right-to-control test of independent contractorship would leave uncompensated those people who are not controlled by those for whom they are performing the work, even though their work is a regular and continuous part of their purported employers' work and even though they cannot afford to insure themselves. *Id.* § 43.42. It is for this reason that Larson suggested the use of the "relative nature of the work" test. *Id.*

In suggesting the relative-nature test, we believe that Larson meant to broaden the category of workers that should be covered by workers' compensation insurance. This would militate against simply replacing the right-to-control test with the relative-nature test, because there may be workers who would be independent under the latter test but not under the former test. Although there appears to be a trend towards such a replacement, in almost all the cases cited by Larson to demonstrate the existence of this trend, the court found the worker to be an employee rather than an independent contractor. *Id.* § 43.54, at 8–32 to –40. In this spirit of broadening workers' compensation coverage, one commentator, cited by Larson, suggests that "[w]hen control is suspiciously absent or the results of applying the control test are inconclusive, the 'relative nature of the work' test should be used." *Id.* § 43.54, at 8–39 n. 20 (*citing* Dean Stern, Comment, *The Employment Relation in Workmen's Compensation and Employer's Liability Legislation*, 10 U.C.L.A.L.Rev. 161, 173–74 (1962)). This suggestion seems sound to us. It leads to the conclusion that, in the context of the Workers' Compensation Act, either test of independence can be used to demonstrate that a worker or a subcontractor is *not* an independent contractor, from which it follows that *both* tests must be met for a worker or subcontractor to be considered independent.

If a broad interpretation of "employment" is appropriate in the context of workers' compensation, we believe that a broad interpretation of "statutory employment" is at least as appropriate. Larson observes that in the process of statutory and judicial broadening of the classes of workers covered by workers' compensation, "[t]he largest single category so brought within coverage is that of the employees of uninsured subcontractors." *Id.* § 43.41, at 8–21. He points out that the purpose of statutory employment provisions is to prevent evasion of the Workers' Compensation Act "by those who might be tempted to subdivide their regular operations among subcontractors, thus escaping direct employment relations with the workers and relegating them for compensation protection to small contractors who fail to carry ... compensation insurance." 1C Larson, *supra,* § 49.15, at 9–29 to –31 (footnote omitted).

■ In keeping with the purpose of the Workers' Compensation Act and the particular purpose of the statutory-employer provision, we hold that both the right-to-control test and the relative-nature test must point to independence before a contractor will be deemed an independent contractor for purposes of Section 52–1–22. We suggest that trial courts and Workers' Compensation Administration ALJs first determine whether a subcontractor meets the right-to-control test. If that test fails to point to independence, then the subcontractor is definitively not independent, and there is no need to apply the relative-nature test. If the test does point to independence, then the court should apply the relative-nature test. If that second test fails to demonstrate independence, then the subcontractor is once again not independent. Only if *both* tests point to independence is the subcontractor deemed independent for purposes of Section 52–1–22.

If it is determined by this method that a subcontractor is not independent, then the first requirement of Section 52–1–22 is satisfied. To show that the general contractor is a statutory employer, the second requirement of Section 52–1–22, the "part or process" requirement, must still be satisfied.

■ In discussing the factors evidencing right of control, Professor Larson identifies four: (1) direct evidence of the right or exercise of control; (2) the method of payment; (3) furnishing of equipment; and (4) the right to fire. 1B Larson, *supra,* § 44.31, at 8–89. *See also Yerbich,* 89 N.M. at 69, 547 P.2d at

74. Larson also notes that "[i]t is commonly assumed that these tests work with equal force in both directions." 1B Larson, *supra*, § 44.31, at 8–89. In practice, however, if any single factor evidences the right to control, that factor will be dispositive; "while, in the opposite direction, contrary evidence is as to any one factor at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all." *Id.* § 44.31, at 8–90. Larson sums it up:

> Independent contractorship, then, is established usually only by a convincing accumulation of these and other tests, while employment, although a similar accumulation is often attempted, can if necessary often be solidly proved on the strength of one of the four [factors.]

*Id.* This means that if one is attempting to prove the existence of an independent-contractor relationship, the proponent bears a heavier burden than one who attempts to prove its non-existence. This principle is also part of the broadening of the classes of workers covered by workers' compensation, and we hereby adopt it.

 Thus, in the cases before us, Romero will succeed in attaching liability to Shumate for compensation benefits if he can prove any one of the factors evidencing right of control and then go on to prove that the "part or process" requirement of Section 52–1–22 is met. If Jaynes proves any of these factors and then proves the "part or process" requirement, it will be a statutory employer of the employees of Superior and thus immune from suit in tort by Harger. In both cases, the method-of-payment and furnishing-of-equipment factors point toward independence, because the payments to the subcontractors were by lump sum and the subcontractors had to furnish their own equipment. However, a number of provisions in the two contracts furnish evidence of the general contractor's right to control. For example, the contract between Shumate and Fay's required Fay's to pay a certain scale of wages and to use monies from Shumate to pay for labor and materials before spending it elsewhere; it required Fay's to carry workers' compensation insurance; it required Fay's to follow Shumate's safety policy; and it allowed Shumate to clean up Fay's project site if Fay's failed to do so and to charge Fay's in such event. Similarly, the contract between Jaynes and Superior required Superior to carry workers' compensation insurance; it required Superior to follow a set schedule, which Jaynes could modify, and to coordinate its activities with Jaynes and other employees and subcontractors; it required Superior to follow safety measures established by Jaynes; it allowed Jaynes to hold Superior in default for not having enough properly skilled workers and proper materials; and it required Superior to clean up the site and permitted Jaynes to charge Superior for any cleanup Superior failed to do.

Many of these contractual requirements demonstrate the extent to which the general contractor needed the power to exercise control in order to coordinate a myriad of interdependent details. Professor Larson cites 'similar cases in which it was necessary to coordinate such details. 1B Larson, *supra*, § 44.23. He observes that in such cases, "the .modern tendency is to infer that the employer must necessarily have reserved the right to control as many details as are necessary to keep all the gears in his production machine smoothly meshed together." *Id.* § 44.23, at 8–88 (footnote omitted). Therefore, we hold, as a matter of law, that the first factor of the right-to-control test evidences an employment relationship in both *Romero* and *Harger*.

 Larson also points out that the right to fire is generally the most important of the four right-to-control factors. *Id.* § 44.35(b). Jaynes had the power to terminate the contract with Superior and hold it in default, not just for failure to properly complete the finished product, but also for failing to follow Jaynes's safety codes or "fail[ing] to supply enough properly skilled workers, proper materials, or ... to make prompt payment for its workers." A similar provision exists in the contract between Fay's and Shumate. As Larson asserts, "[t]he absolute right to terminate the relationship without liability is not consistent with the concept of independent contract, under which the [independent] contractor should have the legal right to complete the project contracted for and to

treat any attempt to prevent completion as a breach of contract." *Id.* § 44.35(a), at 8–167, –177 (footnotes omitted). We hold as a matter of law, therefore, that this factor also evidences an employment relationship in each of the two cases. The fact that the first and fourth factors both point to an employment relationship leads us to hold, as a matter of law, that neither Fay's nor Superior were independent contractors for purposes of Section 52–1–22. Because we base this conclusion on the right-to-control test, we need not analyze these cases in terms of the relative-nature test.

Before moving to the second requirement of Section 52–1–22, the "part or process" requirement, we wish to address briefly several arguments that Harger makes. First, Harger argues that because the contract between Jaynes and Superior specifically refers to Superior as an independent contractor, we must conclude that Superior was in fact independent. *Yerbich* pointedly refutes this argument. *Yerbich*, 89 N.M. at 68–69, 547 P.2d at 73–74. Second, Harger argues that by referring to Superior as independent, Jaynes waived the exclusivity provisions of the Workers' Compensation Act. He relies in part on *Matkins v. Zero Refrigerated Lines, Inc.*, 93 N.M. 511, 602 P.2d 195 (Ct.App.1979), in support of his argument. However, *Matkins* did not involve a subcontractor; rather it involved one employer who lent its employees to another: Although the *Matkins* court did not describe the relationship as one of master to borrowed servant, the facts of the case strongly suggest that. The decedent in that case was working for a trucking company that leased its trucks to Zero and provided drivers, including the decedent, to Zero as well. *Id.* at 512–13, 602 P.2d at 196–97. Professor Larson says that the statutory-employer provisions do not apply to lent-employee relationships. 2A Larson, *supra*, § 72.31(d), at 14–246 to –248. *See also Rivera*, 118 N.M. at 676–677, 884 P.2d at 835–36. Thus, *Matkins* is sufficiently distinguishable from the present case. Finally, Harger argues that Jaynes did not "procure" the work done by Superior, because it was the Zuni Public Schools that solicited the bids of all the subcontractors on the project. Therefore, Har-

ger claims that Section 52–1–22 does not apply to Jaynes. We hold that any contractual arrangement satisfies the meaning of "procure" in the context of Section 52–1–22, no matter *who* solicited the work. To hold otherwise would be to decide workers' compensation liability on the basis of who originally solicited the work in question, and this we think the legislature did not intend.

### C. Part or Process in the Trade or Business or Undertaking

This brings us to the second requirement of Section 52–1–22. Professor Larson observes that cases applying statutory-employer provisions that include variants of the requirement that the work in question be "part or process in the trade or business ... of such employer", *see* § 52–1–22, generally hold that the provision "covers all situations in which work is accomplished which [the] employer, *or employers in a similar business*, would ordinarily do through employees." 1C Larson, *supra*, § 49.16(a), at 9–38 to –43 (emphasis added) (footnote omitted). Shumate alleges that its employees do not normally engage in sandblasting and refinishing and that the company is not equipped to do so. However, whether or not employers in *similar* businesses ordinarily perform that work through employees is a question of fact. It is also a fact question whether contractors in construction projects such as schools ordinarily perform their own mechanical work.

It is not necessary, however, for us to limit our discussion to what kind of work these contractors, or contractors like them, do. Although a number of states incorporate the concept of "undertaking" into their definitions of statutory employer, *see, e.g.,* Md. Ann.Code § 9–508(a)(1) (1991) ("undertake" refers to work that the general contractor does by contract for another party, but the work done must be part of the contractor's trade, business or occupation); Va.Code Ann. § 65.2–302 (Michie 1991) (same); Kan.Stat. Ann. § 44–503(a) (1993) (virtually the same), according to our research, New Mexico is unique in having added the words "or undertaking" to the commonly used phrase "part of the trade or business." Section 52–1–22.

Even if a given kind of work is not "part or process of the trade or business" of the contractor, it meets the second requirement of Section 52–1–22 if it is part of the contractor's "undertaking". *See Abbott v. Donathon*, 86 N.M. 477, 479, 525 P.2d 404, 406 (Ct.App.1974). Jaynes argues that the added phrase should be read expansively. We agree. In *Abbott*, the claimant's decedent was hauling dirt for the contractor defendant, who was undertaking the project of deepening an irrigation pond for a customer. *Id.* Even though the contractor contended that he was engaged in a project that was not part of his normal business and therefore the work by the decedent was not part of his trade or business, the court held that it was an undertaking within the meaning of the predecessor statute to Section 52–1–22. *Id.* The meaning of "undertaking" to be used in this context is the ordinary dictionary meaning. *Id.*

In the cases before us, the undisputed facts about the nature of Fay's and Superior's work convince us that the work is part or process of the undertaking of their respective general contractors. Both contractors undertook large or substantial construction projects, and they subcontracted out parts of those projects—sandblasting and refinishing in one case and mechanical installation in the other. The subcontracted work was an integral part of the projects in the sense that they would not have been complete without that work. Neither case is about a contractor or subcontractor who performs occasional work for an owner of a business, such as in *Tafoya*. Nor do the cases involve repairs to completed structures. Rather, they involve projects that have definite time frames and include a number of necessary components, and those components were parcelled out to subcontractors such as Fay's and Superior. We hold that the undertaking of such projects by general contractors falls within the meaning of the second requirement of Section 52–1–22. Therefore, Jaynes was properly granted summary judgment against Harger, who was seeking common law damages, and Shumate was not properly granted summary judgment against Romero, who was seeking workers' compensation benefits.

### III. *SSI was not a Co-employee of Superior*

SSI argues that it and Superior were co-statutory employees of Jaynes, and therefore SSI is covered under the exclusivity provision of the Workers' Compensation Act by virtue of its status in relation to Jaynes. If SSI were correct, then it would follow that the company would be immune to suit in tort by Harger, thus justifying the trial court's grant of summary judgment in SSI's favor. Section 52–1–6(E) (effective January 1, 1992). However, in none of the cases cited by SSI in support of its argument are the employees in question corporations or subcontractors. *See, e.g., Roseberry v. Phillips Petroleum Co.*, 70 N.M. 19, 369 P.2d 403 (1962); *Hockett v. Chapman*, 69 N.M. 324, 366 P.2d 850 (1961); *Gallegos v. Chastain*, 95 N.M. 551, 624 P.2d 60 (Ct.App.1981); *Matkins v. Zero Refrigerated Lines*, 93 N.M. 511, 602 P.2d 195 (Ct.App.1979).

There is no New Mexico precedent creating a concept of co-statutory employee or using the co-employee concept in a context where an employee of one subcontractor of a general contractor sues another subcontractor in tort. There is also very little support for this idea in other jurisdictions. 2A Larson, *supra*, § 72.32. The reason as given by Professor Larson is that "the general contractor has a statutory liability to the subcontractor's employee, actual or potential, while the subcontractor has no comparable statutory liability to the general contractor's employee." *Id.* § 72.32, at 14–269 to –274. In other words, the quid pro quo for the protection afforded to the workers, whether that protection is used or not, provides the basis for the immunity granted by the Worker's Compensation Act. SSI, as a subcontractor who neither provided nor was required to provide insurance protection for the employees of other subcontractors, should not enjoy the same immunity.

### CONCLUSION

We therefore reverse summary judgment in favor of SSI. For reasons given above, we also reverse summary judgment in favor of Shumate, and we affirm summary judgment

in favor of Jaynes. Harger shall recover one-half his cost of appeal against SSI.

**IT IS SO ORDERED.**

PICKARD, J., concurs.

BOSSON, J., (dissenting).

BOSSON, Judge (dissenting).

Over thirty years ago George DeArman, an oil field roughneck working for an independent contractor, was seriously injured when heavy equipment supplied by the well owner collapsed unexpectedly, falling thirty feet to the rig floor below and striking DeArman. *DeArman v. Popps,* 75 N.M. 39, 400 P.2d 215 (1965). DeArman received workers' compensation from his employer. He then filed suit against the well owner, Sunset International Petroleum Corporation, alleging negligent supervision of the various contractors working on the site. Our Supreme Court rejected Sunset's argument that its control over the project and the work of the various contractors made DeArman an implicit employee of Sunset which would have limited his remedies to the benefits available under the Workers' Compensation Act. Instead the Court permitted DeArman to sue in tort under a theory of retained control, as set forth in *Restatement (Second) of Torts* § 414 (1965). The Court held that Sunset owed a duty of reasonable care to employees of independent contractors to the extent it retained control over the project. Therefore, DeArman was not limited to statutory remedies under workers' compensation, and Sunset was not immune from suit.

The opinion in *DeArman* has evolved over the past thirty years into a substantial body of law in New Mexico. Founded on principles articulated in the *Restatement,* an employer of a contractor, whether called an owner, operator, general contractor, or the like, has a duty to provide a reasonably safe work place, not only for its own employees, but for the workers of its subcontractors as well, at least to the extent it retains some contractual control over the project and the work product of the subcontractor. *See, e.g., Requarth v. Brophy,* 111 N.M. 51, 801 P.2d 121 (Ct.App.1990); *Tipton v. Texaco, Inc.,* 103 N.M. 689, 712 P.2d 1351 (1985); *Valdez*

*v. Cillessen & Son, Inc.,* 105 N.M. 575, 734 P.2d 1258 (1987); *New Mexico Elec. Serv. Co. v. Montanez,* 89 N.M. 278, 551 P.2d 634 (1976); *Fresquez v. Southwestern Indus. Contractors & Riggers, Inc.,* 89 N.M. 525, 554 P.2d 986 (Ct.App.), *cert. denied,* 90 N.M. 8, 558 P.2d 620 (1976). The principle has been applied to the oil field, where the owner/operator customarily hires specialty contractors with their own employees instead of performing the work in-house. *See Tipton; DeArman.* The same principle has been applied to construction projects, both large and small, where the project is led by a general contractor and implemented by a host of specialty subcontractors each with their own employees. *See Requarth,* 111 N.M. at 51, 801 P.2d at 121; *Valdez,* 105 N.M. at 575, 734 P.2d at 1258; *Fresquez,* 89 N.M. at 525, 554 P.2d at 986. Our courts continue to apply these principles.

In one of the two cases before us, plaintiff Harger, an employee of a subcontractor, seeks to apply this same proven theory against the general contractor, Jaynes Corporation. Harger sues on a theory of unsafe work place. According to clearly established precedent, if Harger can prove that Jaynes retained certain control over the project, then under the *Restatement,* Harger is entitled to an opportunity to prove his case at trial.

The majority opinion denies Harger this opportunity because he supposedly has become a "statutory employee" of the general contractor as well as an actual employee of his own subcontractor. Ironically, the holding is premised in part upon Jaynes' retained control over the subcontractor, which, of course, is the very element under the *Restatement* § 414 which creates liability in tort. Harger is thereby placed in an impossible position: he must disclaim control by Jaynes over its contractors to avoid the statutory employee statute, while he must prove the very opposite to prevail at trial. We are left, then, to wonder, and to shudder, at the prospects of future workers and the degree to which their claims in tort have now been foreclosed.

I believe the George DeArmans of New Mexico are now seriously at risk. How did

72

we get into such a paradox? What could possibly justify such a result? I suppose the majority would first postulate that its holding makes no change in the law; it merely interprets a statute which has been in existence for some time, and theoretically has always meant the same thing. George DeArman would be the first one surprised by such an argument. Make no mistake about it—whatever the boundary lines—the majority opinion, if left standing, is a substantial change in the law. The fact of the matter is that the majority has taken an obscure section of the workers' compensation law and breathed an aggressiveness into it never before known in its 65 years of viability. *See* 1929 N.M.Laws, ch. 113, § 12(O). It requires no great imagination to realize that the present opinion grants general contractors a dimension of tort immunity which exceeds their wildest dreams—one which, I wager, they could never reasonably expect to enact into law by the democratic process of legislation. This watershed event substantially alters the delicate balance between statutory, no-fault workers' compensation insurance and the assignation of fault and financial responsibility by way of common law suit in tort.

An event of such proportion is usually accompanied by resounding principles of law and equity, and I discern in the majority's reasoning no less noble an effort. Candidly, the majority does not try to base this result on the force of New Mexico precedent; it recognizes that its opinion is premised largely upon considerations of policy, with which one can honestly disagree. Citing to Professor Larson, the majority heralds the public good from encouraging workers' compensation coverage and even backup coverage. The majority relies upon the factual premise of: (1) a contractual requirement imposed upon subcontractors to provide workers' compensation insurance, and (2) some kind of fiscal scheme whereby the general contractor "pays for" or "reimburses" for the subcontractor's cost of providing insurance. *See Quintana v. University of California,* 111 N.M. 679, 682, 808 P.2d 964, 967 (Ct.App.), *cert. denied,* 111 N.M. 678, 808 P.2d 963 (1991). *But see Matkins v. Zero Refrigerated Lines, Inc.,* 93 N.M. 511, 513, 602 P.2d 195, 197 (Ct.App.1979). These two factual elements arguably inject the general contractor into the workers' compensation equation, and thereby, it is argued, the general contractor becomes as much a provider of insurance as the subcontractor. Because this is a good thing, we are told, the general contractor deserves the reward of tort immunity. This is certainly one acceptable view of public policy which favors no-fault workers' compensation over the rising cost involved in attributing fault through the laborious process of litigation. Professor Larson undoubtedly subscribes to this policy, and there is authority in other states as well.

It may also be supposed that these factors distinguish prior tort cases, such as *DeArman,* because no such contractual provision is noted in them. However, no one knows if George DeArman's contractor had such a provision in its contract with the oil field owner/operator. We may assume not, since the point was not discussed. But it is speculative at best to try to read too much into old cases, where the issue is not even raised. It is, at best, a debatable point.

I question the significance of a contractor including such a requirement in its contracts. To be sure, from now on there will be one in every contract between an employer and a contractor. It costs the employer little to assure contractually a provision which the law already requires, and which many times, as in the case of Harger, may already be in place and paid for! In exchange for such "assurance" the employer is given absolute tort immunity. This is some bargain!

The majority opinion's omission of any reference to *DeArman,* its progeny, and the important principles for which they stand is also troublesome. This omission is all the more glaring since the Supreme Court in *DeArman* discussed the leading workers' compensation employee/independent contractor cases of the time, distinguished them, and concluded, unlike the majority in this opinion, that there was nothing in the Act inconsistent with imposing tort liability and a duty of reasonable care to contractor's employees by proof of retained control over the work site. *See DeArman,* 75 N.M. at 48–49, 400 P.2d at 221.

Further, there is substantial authority which does *not* subscribe to Larson's view, including cases holding the general contractor liable in tort even if it actually paid workers' compensation benefits, *see, e.g., Miller v. Northside Danzi Constr. Co.,* 629 P.2d 1389 (Alaska 1981); *Laffoon v. Bell & Zoller Coal Co.,* 65 Ill.2d 437, 3 Ill.Dec. 715, 359 N.E.2d 125 (1976), and other cases granting tort immunity only where the general contractor actually paid compensation benefits as opposed to a mere contingent liability in a contract, *see Webb v. Montana Masonry Constr. Co.,* 233 Mont. 198, 761 P.2d 343 (1988); *Prive v. M.W. Goodell Constr. Co.,* 119 N.H. 914, 409 A.2d 1149 (1979); *Lewis v. Lockard,* 498 N.E.2d 1024 (Ind.Ct.App.1986); *Baldwin Co. v. Maner,* 224 Ark. 348, 273 S.W.2d 28 (1954); *Fonseca v. Pacific Constr. Co.,* 54 Haw. 578, 513 P.2d 156 (1973); *Nash v. Damson Oil Corp.,* 480 So.2d 1095 (Miss. 1985); *Pate v. Marathon Steel Co.,* 777 P.2d 428 (Utah 1989); *see generally* Benjamin Marcus, *Advocating the Rights of the Injured,* 61 Mich.L.Rev. 921 (1963); Allan H. McCoid, *The Third Person in the Compensation Picture: A Study of the Liabilities and Rights of Non–Employers,* 37 Tex.L.Rev. 389 (1959).

But the weight of out-of-state authority is not the point, at least not in my view. What is "enough" or "too much" workers' compensation coverage, and at what cost to the worker and to society as a whole in terms of tort immunity, are truly imponderable issues. There is no right or wrong side; there is only point and counterpoint. That is why these issues belong in the legislative arena. The majority opinion wrongly usurps the legislative prerogative.

Anyone alive and breathing over the past decade knows of the battles that have raged in New Mexico legislative halls over workers' compensation. Love it or hate it, the Act is the essence of the legislative process. The present statute, amended time and again, is a classic example of legislative compromise. In the course of casting and recasting this statute, the legislature has left alone the statutory employee section; it has remained the same, existing in silence and relative obscurity through all the legislative wars,

exactly as it was created back in 1929. *See* Laws, *supra.* Surely the most that can be attributed to legislative intent in keeping this statute intact is an effort to maintain the equilibrium of the status quo, whatever that has been. This statute has been almost totally ignored by New Mexico's litigants and by our courts, and as we have seen, tort litigation in comparable circumstances has flourished. Clearly, this statute is scant authority for the position advanced by the majority.

We are reminded by our Supreme Court that workers' compensation is no nirvana; it is merely a "legislative scheme ... to keep the claimant off the welfare rolls, not to provide a complete tort recovery for compensation of all damages suffered." *See Continental Ins. Co. v. Fahey,* 106 N.M. 603, 606, 747 P.2d 249, 252 (1987). Therefore, the very goal of the majority—expanding and insuring back-up workers' compensation coverage—is a questionable bargain at best considering the terrible cost to the victim. It will be little solace to these workers that this has been accomplished supposedly in the name of helping them. And one wonders what of the clear, express legislative intent that third parties, "any person other than his employer," who are at fault shall be held accountable, and indeed shall reimburse the workers' compensation carrier for negligence proximately causing employee injury. *See* NMSA 1978, § 52–1–6(E) (Repl.Pamp.1991):

> Nothing in the Workers' Compensation Act, however, shall affect or be construed to affect, in any way, the existence of or the mode of trial of any claim or cause of action that the worker has against any person other than his employer....

Oil field roughneck George DeArman was joined by his employer's workers' compensation carrier in the lawsuit seeking contribution from the owner whose negligence may have contributed to the worker's injury. How indeed is Mr. Harger's situation any different with respect to Jaynes Corporation? In other words, if Mr. Harger had brought this case in 1965, he would have prevailed under the law established by our Supreme Court in *DeArman,* just as he should now.

The majority acknowledges that most of the existing New Mexico cases on employee/independent contractor are framed in the context of trying to obtain workers' compensation coverage in the first instance, as opposed to no coverage at all, by a presumption in favor of the status of employee over independent contractor. *See Shipman v. Macco Corp.*, 74 N.M. 174, 392 P.2d 9 (1964) (distinguished in *DeArman*); *Bailey v. Farr*, 66 N.M. 162, 344 P.2d 173 (1959); *Burruss v. B.M.C. Logging Co.*, 38 N.M. 254, 31 P.2d 263 (1934); *see, e.g., Tafoya v. Casa Vieja, Inc.*, 104 N.M. 775, 727 P.2d 83 (Ct.App. 1986); *Dibble v. Garcia*, 98 N.M. 21, 644 P.2d 535 (Ct.App.), *cert. denied*, 98 N.M. 50, 644 P.2d 1039 (1982); *Yerbich v. Heald*, 89 N.M. 67, 547 P.2d 72 (Ct.App.1976); *Burton v. Crawford & Co.*, 89 N.M. 436, 553 P.2d 716 (Ct.App.), *cert. denied*, 90 N.M. 7, 558 P.2d 619 (1976). These are not so-called "statutory employee" cases, and by and large, they completely ignore that section of the Act. With the policy bias of trying to secure coverage for injured workers, it is no surprise that most opinions lean discernibly in their analysis towards finding a worker to be an employee and not an independent contractor. *See Yerbich*, 89 N.M. at 68–69, 547 P.2d at 73–74.

It follows that if these same cases are applied literally to the statutory employee context, where the worker already has coverage, then the result will be similarly skewed by a presumption that a contractor is "a contractor other than an independent contractor." *See* NMSA 1978, § 52–1–22 (Repl. Pamp.1991). The majority has chosen to make this extension, resulting in presumptions and a burden of persuasion in favor of finding non-independence of the contractor. The majority states: "If a broad interpretation of 'employment' is appropriate in the context of workers' compensation, we believe that a broad interpretation of 'statutory employment' is at least as appropriate."

It is here that I part company, not with the underlying case law, but with its application to the statutory employee context, which, I maintain, is unprecedented and unauthorized in New Mexico law. I read the statute to apply only where subcontractor insurance proves unavailing or deficient. Then the general contractor is truly "liable to pay all compensation under the ... Act to the same extent as if the work were done without the intervention of such contractor." Section 52–1–22. Unless the general contractor truly "pays all compensation"—more than just backup assurances—then its liability is merely contingent. Unless liability to that worker is actually "to pay all compensation," then I fail to see the *quid pro quo* for the worker's loss of tort action. *See Matkins*, 93 N.M. at 513, 602 P.2d at 197 (when someone else pays actual benefits to the injured employee, employer surrenders exclusivity of workers' compensation statute).

Other jurisdictions have a similar view. *See Fonseca; Nash; Pate.* In *Nash* the Supreme Court of Mississippi said the following about tort immunity in exchange for contingent liability: "Where the 'contractor' invoking the protections of the exclusiveness of liability statute is not itself liable for compensation to the injured worker, illogic, if not absurdity, would attend our sustaining that contractor's exclusivity defense." *Nash*, 480 So.2d at 1099. Whether this position falters from "illogic" or "absurdity," I fail to see where we get the authority to make such a judgment, in light of the clear choice of the legislature to leave things as they have been for well over half a century.

Two recent New Mexico cases touch on this subject but, in my opinion, do not compel the result reached today. The first is *Quintana*, 111 N.M. 679, 808 P.2d 964, the only New Mexico case in 65 years to deal substantively with the statutory employee statute. In that case the defendant, Los Alamos National Laboratory ("LANL"), entered into a contract with Pan Am Services, Inc. to provide essential administrative services such as management, administration, equipment installation, building construction, and custodial maintenance. These were services which normally would be provided by the defendant's own employees and services over which the defendant exercised detailed control. By contract, Pan Am was required to provide workers' compensation coverage for its employees, for which LANL was then responsible to reimburse Pan Am as part of

its costs. Plaintiff, a Pan Am employee, filed suit against LANL for negligent operation of a vehicle by a LANL employee. Plaintiff also received workers' compensation benefits from Pan Am. The trial court dismissed plaintiff's negligence claim on the grounds that LANL was a statutory employer under Section 52–1–22 and therefore, entitled to immunity under the exclusivity provisions of the Act.

On appeal, this Court affirmed and held, based upon the facts of the case, that defendant satisfied the classic tests under New Mexico law of "power of control" and "relative nature of the work" to prove that Pan Am was a "contractor other than an independent contractor" under Section 52–1–22. *Quintana*, 111 N.M. at 682–83, 808 P.2d at 967–68. The opinion applied the usual precedents establishing these tests. LANL then became a "statutory employer" under the Act and entitled to immunity from tort litigation.

Taken this far, the opinion breaks little new ground. It is premised upon the special relationship between the parties which demonstrated detailed control in LANL and a status in Pan Am which can be interpreted as almost an alter ego of LANL with respect to providing LANL's essential services. However, in dictum the opinion also pays deference to the so-called "modern trend" of Professor Larson which would secure tort immunity merely by contractually assuring insurance coverage and providing some mechanism for financial reimbursement. It is this portion of the opinion which is seized upon by the majority in our case and with which I disagree. I have already emphasized my reservations at joining a so-called "modern trend" based upon a statute which is anything but modern and which prior to *Quintana* had never in its history been interpreted in this fashion. Second, *Quintana's* reference to Larson was made without much analysis of the important policy considerations behind such a sweeping concept, probably because it was not essential to the holding of the case. Third, even the *Quintana* opinion refers to the insurance coverage and reimbursement evidence as "a matter not germane to our discussion," because the opinion was grounded upon other principles. *Id.* at

682, 808 P.2d at 967. Even the majority opinion candidly acknowledges that *Quintana* went only "part of the way." In my judgment the majority opinion should be confined to this special set of facts, and we should not journey "the rest of the way," nor are we obliged under *Quintana* to place undue emphasis on a mere contingent liability.

In *Garcia v. Smith Pipe & Steel Co.*, 107 N.M. 808, 765 P.2d 1176 (Ct.App.), *cert. denied*, 107 N.M. 673, 763 P.2d 689 (1988), a borrowed employee-employment agency case, the employer expressly paid for the workers' compensation coverage, but the actual insurance was procured by the employment agency. This Court followed the money so to speak and held that within the context of that case, the employer had done enough to fall within the protection of the exclusive remedy section of the Act. In the case before us the parties make much of this fact. However, this Court, in *Quintana*, went to great pains to limit the holding in *Garcia*. We emphasized that the parties in *Garcia* had *stipulated* to the existence of an actual employer/employee relationship, which, of course, leads directly to workers' compensation coverage and tort immunity. *Quintana*, 111 N.M. at 683, 808 P.2d at 968. We expressly disagreed that *Garcia* could be construed to mean that merely the purchase of workers' compensation coverage, subject to reimbursement by the employer, would bar plaintiff's personal injury suit under the exclusivity provision. *Id.* In fact, *Garcia* says nothing about the statutory employee statute. Accordingly, in my view, *Garcia* does not stand for any far-reaching interpretation that would afford statutory employee status to anyone who reimburses or otherwise pays for compensation insurance. The employer merely used the indirect means of agency to satisfy the duty it owed under law of providing workers' compensation coverage to its own employees, including Mr. Garcia. As we made clear, it was intended to be confined to the special circumstances of that case and to those class of cases known as borrowed or special employees. *See Rivera v. Sagebrush Sales, Inc.*, 118 N.M. 676, 884 P.2d 832 (Ct. App.1994).

The final question pertains to the companion case, *Romero v. Shumate Constructors, Inc.* In one sense this case might be viewed as the very situation Section 52–1–22 was designed to prevent, where a subcontractor has no insurance and abandons its worker. It would appear that there is a certain fairness in enabling the worker to look to the general contractor. Similarly, the general contractor would have earned tort immunity by becoming "liable to pay all compensation." To my eye, however, this is not how the statute reads. Under *Quintana*, Section 52–1–22 should be limited to the exceptional circumstance. The facts in the *Romero* case do not indicate that the subcontractor, Fay's Painting Co., was anything other than an independent contractor. The worker must look to Fay's for his workers' compensation coverage. He must look to tort for anything else. Therefore, I would affirm the *Romero* case and reverse the entire *Harger* case. Having stated my opinion and being in the minority, I respectfully dissent.